PRODUCERS PRODUCE COMPANY, Respondent, v. INDUSTRIAL COMMISSION OF MISSOURI DIVISION OF EMPLOYMENT SECURITY et al., Appellants, No. 45190—291 S. W. (2d) 166.

Court en Banc, May 14, 1956.

Rehearing Denied, June 11, 1956.

*George Schwartz, Lloyd G. Poole* and *Howard L. McFadden* for appellants.

998

*Glenn A. Burkart, Frank C. Mann* and *Mann, Mann, Walter & Powell* for respondent.

[168]    DALTON, J.—This is an appeal by the Industrial Commission of Missouri, Division of Employment Security, from a judgment of the circuit court of Greene County reversing certain findings and final awards of the Commission in favor of named claimants for unemployment benefits. The judgment was entered as the result of a proceeding instituted in the circuit court by the employer, Producers Produce Company, for a judicial review of the findings and final awards of the administrative agency. Section 288.190 RSMo 1949, amended Laws 1951, p. 564, Section 288.210 VAMS.

Nine separate appeals in cases involving unemployment benefits claimed by employees of respondent Producers Produce Company under the Unemployment Compensation Law (now known as the Missouri Employment Security Law, Laws 1951, p. 564) have been consolidated by agreement on the theory that the issues involved in each of the appeals are the same and that they have the same factual basis. The appeals were taken to the Springfield Court of Appeals

and that court reversed the judgment of the circuit court as to each of the claimants in each of the consolidated cases and ordered the final awards of the Industrial Commission as to each claimant reinstated. Producers Produce Company v. Industrial Commission (Mo. App.) 281 S. W. 2d 619. Reference is had to the first two pages of that opinion for a preliminary statement of the facts. The cases have been transferred to this court by order of the Springfield Court of Appeals because of the general interest and importance of the questions involved.

Appellants say "the principal question presented is whether striking employees are ineligible for unemployment benefits so long as they remain on strike, in spite of evidence, and a finding by the Industrial Commission, that the 'stoppage of work' at the employer's establishment originally caused by the strike no longer exists." Respondent says that "these cases involve 537 separate claims for benefits under the Unemployment Compensation Law made by two hundred individuals, who received some $60,000, in toto, by way of benefits under said act as a result of awards made by administrative tribunals in the administration of the Law"; and that "the general question is whether a striker is entitled to unemployment compensation benefits while he is actively engaged in picketing the employer's plant, and the further question is whether an employer must finance a strike against his own plant with funds he has set aside for the benefit of his employees * * *." Appellants reply that "such was not the question, the issue being simply whether these claimants, after having been replaced in their jobs while on strike, were entitled to benefits if they complied with other pertinent provisions of the Employment Security Law, including among others, the one requiring them to be available for work." Respondent's interest in the cases arises from the fact that unemployment benefits paid are chargeable to the employer's "account", and the aggregate of such charges, in its relation to the contributions previously paid into the fund, may prevent a reduction or bring about an increase in the employer's future contribution rates. Sections 288.050 and 288.060 RSMo 1949. The record presented here consists of 23 volumes, plus a supplemental [169] transcript of proceedings in the circuit court, in all a total of over 4800 pages. We shall determine the issues presented as if on original appeal to this court. Art. V, Sec. 10, Const. of Missouri 1945. No new briefs have been filed in this court. The appeals have been argued here and submitted upon the same briefs and records as filed in the Court of Appeals.

The evidence common to all of the claims shows, among other things, that respondent Producers Produce Company is a Missouri corporation, organized under the Agricultural Cooperative Marketing Act and affiliated with the Missouri Farmers Association. It is engaged in the processing of the eggs, poultry and other products of its

member exchanges and others at Springfield, Missouri, and it handles, grades and ships, hides, wool and mohair. On June 3, 1950, respondent had 340 employees on its payroll. On that date, Local 172 of the Amalgamated Meat Cutter and Butcher Workers of North America, an A.F.L. affiliate, represented all of the respondent's production workers in contract negotiations which had been going on for some time prior to that date, and such negotiations involved wage scales and other terms of employment, including the renewal of a contract with the Meat Cutter's Union. On Saturday, June. 3, 1950, the Union called a strike and the claimants, along with other production workers, failed to report for work and instead established a picket line outside the employer's plant. The picket line was continuously thereafter maintained by the Union until January 19, 1951, when an agreement was reached between respondent and the Union for termination of the strike. Respondent's plant was not in operation on June 3, 5, and 6, 1950, but thereafter respondent commenced hiring replacements on June 7th and ultimately resumed "activities, production or service" to the extent hereinafter stated.

Shortly after the commencement of the strike, a considerable number of striking employees initiated claims for benefits under the Unemployment Compensation Law (Sections 288.010 to 288.270 RSMo 1949). Deputies of the Division of Employment Security, charged under the statute with the responsibility for the making of determinations in the first instance on benefit claims (Sec. 288.150, subsection 2, RSMo 1949, amended Laws 1951, p. 564, Section 288.070 VAMS), allowed some claims and denied others on the basis of facts presented. Some of the claimants so denied benefits appealed to the appeals tribunal (also referred to as "Appeals Referee"). The respondent appealed to the appeals tribunal from the determinations made by the deputies which allowed claims for benefits.

Pursuant to the aforementioned appeals, taken by both the claimants and the respondent herein, hearings were held before an Appeals Referee of the Division of Employment Security. Sec. 288.150, subsection 4, RSMo 1949, amended Laws 1951, p. 564, Sec. 288.190 VAMS. Thereafter, the appeals referee rendered decisions in which he denied benefits with respect to claims made for weeks prior to July 9, 1950, on the basis of his finding that in such weeks the claimants were unemployed due to a "stoppage of work" in existence because of the labor dispute at the employer's establishment. He allowed benefits with respect to the claims which were made for weeks subsequent to July 8, 1950, except in cases where he found the claimants to have been unavailable for work and hence ineligible on that ground (Sec. 288.110(3) RSMo 1949). In allowing benefits to those individuals who claimed them for weeks subsequent to July 8, 1950, and who were not found to be unavailable for work, the referee did so on the basis of his finding that the claimants' unem-

ployment in such weeks was not due to a "stoppage of work" in existence because of the labor dispute at the employer's establishment.

The referee made other findings on issues of fact common to all of the claimants, in substance, as follows:

(1) that claimants, in withholding their services from respondent during the strike, did not intend to sever the employment relationship, but instead, "each claimant [170] has, by his persistent interest in the labor dispute and by his participation in the picket line, kept the employer indirectly advised of his continued interest in working after satisfactory negotiations are concluded" and, therefore, they did not leave their work voluntarily within the meaning of the Unemployment Compensation Law; and

(2) that, the claimants' participation in the labor dispute was not of such a nature as to render the claimants unavailable for work; that the picketing duties performed by the claimants were not of such extent as to render them unavailable for work within the meaning of the Act; and that the claimants were unemployed and available for work.

By agreement, these findings (with others) were by reference incorporated in and made part of the decisions relating to the individual cases wherein there was a finding that the claimant had been actively seeking work and was available for work.

Respondent took timely appeals to the Industrial Commission of Missouri from each of the decisions of the appeals tribunal in which benefits were allowed, as aforesaid. Laws 1951, p. 564, Section 288.-200 VAMS. The Industrial Commission denied all of such appeals and affirmed the decisions of the Appeals Tribunal. (Appeals Referee). Thereafter, respondent instituted the necessary proceedings for judicial review of said decisions. Laws 1951, p. 564, Sec. 288.210 VAMS.

As stated, the circuit court ordered reversed, as to each and every one of the claimants, the several decisions (Findings and Awards) of the Appeals Referee, as approved by the Industrial Commission, and the Industrial Commission appealed.

While the Industrial Commission is appellant as far as the judgment of the circuit court reversing the awards to the several claimants is concerned, the employer (respondent) had presented the cases to the circuit court by petitions for review and in reversing the final decisions and awards of the Industrial Commission as made to the several claimants, the trial court had acted upon specific issues presented to it for decision. Therefore, the primary and essential questions presented on this appeal concern the validity of the findings and awards of unemployment benefits, as made by the Appeals Referee and approved by the Industrial Commission, in view of specific issues presented to the circuit court by respondent.

The trial court filed a memorandum opinion and much of appellants' brief is devoted to an attack upon the position and views expressed therein, but we are not here particularly concerned with the reasons assigned by the court for its order reversing the findings and awards, because if the decision is correct it will not be disturbed because the court gave a wrong or insufficient reason therefor. Holland Bank v. Republic Nat. Bank, 328 Mo. 577, 41 S.W. 2d 815, 820; Brown v. Moore (Mo. Sup.), 248 S.W. 2d 553, 556.

In the petition for review, as filed in the circuit court by the respondent-employer, it complained that the Appeals Referee and the Commission erred in finding that claimants' unemployment after July 8, 1950, was not due to a "stoppage of work" existing at employer's establishment due to a labor dispute, and, in further finding that "any failure to produce at a normal rate after that time may well have been due to factors other than the labor dispute." Respondent charged that the evidence showed that there was a substantial diminution of activity, service, production and efficiency in employer's establishment due to the labor dispute long after said date. Error was also assigned on the finding that the employer actually terminated claimants' employment by obtaining replacements and continuing in production without their services; and on the finding that these claimants were available for work and were eligible for unemployment benefits. Substantially the same contentions are now urged by respondent in this court. The Court of Appeals disposed of these fact issues with a statement that the findings of the Appeals Referee, approved by the Commission were supported by substantial evidence. [281 S. W. 2d 619, 624(1)].

Appellants' position here on the first point clearly rests upon the finding that [171] claimants were permanently replaced by other employees of respondent and substantially full production resumed at respondent's plant so that there was no "stoppage of work", after July 8, 1950, because of a labor dispute. That this factual question is vital to the law issue presented is well illustrated in the opinion of the Court of Appeals, as follows: "The issue here presented is one of law as to whether claimants, who in the first instance are ineligible to receive benefits where their original unemployment was due to a stoppage of work because of a labor dispute at the plant of respondent, are later entitled to receive benefits when the employer's plant is operating at full production, claimants have been permanently replaced, a full force of workers are employed at employer's plant, and where claimants are still actively engaged in picketing respondent's plant because of the labor dispute." (281 S.W. 2d 619, 624).

Appellants in this court seek to support the findings of fact and the awards of benefits by the Commission. Appellants say "it is undisputed that a substantial diminution of the activities normally carried on at the respondent's plant occurred following commence-

ment of the strike on June 3, 1950," but that "the referee could reasonably have drawn the inference that normalcy in the employer's operations was restored by * * * July 6, 1950." Appellants concede that "in rendering the decisions in which it allowed benefits to striking employees of the respondent, the Industrial Commission, of necessity had to find (1) that they were not unemployed due to a 'stoppage of work' in existence because of the labor dispute, and (2) that they were 'available for work.'" Appellants argue that the legislature intended that the disqualification by reason of a labor dispute was not to apply where the employer was able, through the employment of replacements or by any other means, to continue or resume his *normal* production, activities or services.

Section 288.010 RSMo 1949, provided that "'stoppage of work' as used in Section 288.120 means a substantial diminution of the activities, production or service at the establishment, plant, factory or premises of the employing unit." (See Laws 1951, pp. 564, 575, now Sec. 288.040 VAMS). Further, Sec. 288.120.2 RSMo 1949 (see Laws 1951, p. 564, now Sec. 288.040.4 (1) VAMS) expressly provided for the denial of benefits to unemployed workers under certain circumstances, to wit, that "2. An individual shall be disqualified for benefits under the following conditions * * * (1) For any week with respect to which the division finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute in the factory, establishment or other premises in which he is or was last employed * * *."

Respondent here contends that the Commission's finding (that the unemployment of claimants, after July 8, 1950, was no longer due to a stoppage of work because of a labor dispute at respondent's plant) is not "supported by competent and substantial evidence upon the whole record." Art. V, Sec. 22, Const. of Missouri 1945; Section 288.190 RSMo 1949; Laws 1951, p. 564, Sec. 288.210 VAMS. Respondent insists that claimants failed to produce competent and substantial evidence to sustain their burden of proof to free themselves from the express disqualification and failed to show that there was no "stoppage of work" at respondent's plant because of a labor dispute or that substantial normal production had been attained. A review of the evidence on the issue is required.

By agreement of the parties, the employer first offered its evidence tending to show that the cause of the stoppage of work was the labor dispute in which claimants participated. This testimony tended to show that prior to June 3, 1950, the day the strike began, the employer had 340 employees on the payroll. The total number of employees varied somewhat according to the season, the volume would go up or down and the number of employees would vary in relation to the season. The bulk of respondent's business was poultry and eggs, "a seasonal operation," but hides, [172] wool and mohair were

handled, graded and shipped. Eggs were candled and processed, some marketed in shells, some separated from the shell, canned and frozen, and some dried and marketed in that manner. The key to the whole operation was the candling room, which had not assumed normal operation on September 19, 1950, when the witness testified. The then employees in that work hadn't had sufficient experience to be classed as good egg candlers. The work was slow, as candling eggs is a technical matter requiring a good deal of training. Approximately 20 per cent of respondent's egg business was ''shell eggs'', 30 per cent was frozen eggs, and 50 per cent powdered eggs. Live poultry was graded, weighed, fed a few days, then slaughtered and picked, cooled and processed in different ways for marketing purposes. Approximately 60 to 70 per cent of the poultry business was ''New York dressed'' poultry and the balance eviscerated poultry. About two-thirds of respondent's business was egg business and one-third poultry. Egg receipts usually hit their peak in March and April, poultry its peak sometime in June, July or August. All eggs offered under normal conditions could be handled, if experienced employees were available. The limiting factor in poultry is the picking room. Shortly after the strike, about June 7th the employer began taking applications for employment in an effort to resume operations. As to progress ''made in building up the operation of the plant and following the strike'', the evidence tended to show that the drying department opened first, as it required less employees, then the plant began receiving poultry from the Farmers' Exchanges in a limited way, and began killing, picking, cooling and packing poultry, later the egg candling began and still later the eviscerating and cutting up of poultry began. No time was fixed as to when these departments began to function even on a limited basis. The new employees were not trained or experienced. In June and July large quantities of spring chickens, more than normal, were offered but the ''picking room wasn't built up'' and the employer had to restrict the deliveries through to July 15 or 20th, because not in a position to handle them. The picking room was ''the bottle neck on the spring chicken operation.''

No incoming eggs from M.F.A. egg exchanges were turned away, they were stored elsewhere and were processed by September 19, 1950. By the middle of July the plant was receiving about the normal quantity of poultry. All restrictions on deliveries of live poultry were removed by July 15 or 20th, 1950. Solicitations of orders for dressed poultry was curtailed during the strike and it was along the middle or the latter part of July before the volume of poultry business got up to where respondent was able to take care of the same volume of this type business that it was taking care of before the time of the strike. Respondent had some poultry and eggs in cold storage at the time of the strike and that continued to be moved afterwards.

Most of the departments were operating normally on September 19, 1950.

At the request of claimants the payroll records as to number of employees were produced and offered, indicating the record of man-hours worked. The records showed more man-hours were worked in the weeks ending June 22 and June 29, July 6, and July 13 than in the week before the strike, but because of the inexperience of employees, more man-hours were required. The records (exhibit 5) indicated that on Friday, June 2, 1950, there were 340 workers employed at respondent's place, about 325 on the regular payroll; that in the week ending June 8, 1950, 161 workers were hired; that respondent continued to hire workers in substantial numbers through the week ending July 6, 1950, but that in the week ending July 13, 1950, it hired only one worker, while laying off 37 and that in the following week respondent laid off 60 workers. No evidence as to the reason for the lay offs was offered. No actual production figures for respondent's plant during the period of the strike were offered in evidence. No one from the production department testified. The total number of employees on the payroll at some time during the successive weeks [173] ending June 8, to July 27, 1950, inclusive, was as follows: 501, 405, 419, 450, 426, 416, 360, 300. A total of 127 individual workers "quit" between June 7 and July 27.

On this record the Appeals Referee found: "The number of workers hired and retained would indicate an effort to resume normal output by increased production. * * * the claimants' unemployment through July 8, 1950, was due to a stoppage of work existing at the employer's establishment. After July 8, 1950, the employer did not hire new workers in substantial numbers, and, in fact, laid off many workers in the week ending July 13, and in the following week. Since it appears that efforts toward increased production would have compelled the use of these workers for any services they might have performed, *it appears that any failure to produce at a normal rate after that time may well have been due to factors other than the labor dispute.* The Referee finds that after July 8, 1950 there was no substantial diminution of *activities* in the employer's plant due to the labor dispute, and that the claimants' unemployment after July 8, was not due to a stoppage of work existing at the employer's establishment due to a labor dispute." (Italics ours).

The burden of proof to establish the right of the claimants to benefits under the Unemployment Compensation Law rested upon the claimants. Haynes v. Unemployment Compensation Commission, 353 Mo. 540, 183 S.W. 2d 77, 81. Claimants were eligible for benefits only if the commission found, from competent and substantial evidence, that the required conditions have been met and that claimants were qualified. Section 288.120 RSMo 1949 [now Sec. 288.040.-4(1) VAMS], expressly provided that unemployed workmen should

be disqualified for benefits "For any week with respect to which the division finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute in the factory, establishment or other premises in which he is or was last employed." And see other provisions of said section.

It is admitted that the labor dispute in question at respondent's plant extended from June 3, 1950 to January 16, 1951. The express disqualification provided by Sec. 288.120, supra, was not a matter of defense. It was not a matter of a statutory *exception* to a general rule granting benefits, but it was an express disqualification. The burden was on claimants to show they met the conditions required for benefits. The appellant Commission and the Appeals Referee recognized the necessity for an express finding that these claimants were not subject to the express disqualification provided by said section before being entitled to receive unemployment benefits. We have set out the evidence and the finding of the Referee, approved by the Commission. This court may not substitute its judgment on the evidence for that of the administrative tribunal, but it must decide whether upon the whole record the appellant, Industrial Commission could reasonably have made its findings and reached its result. Meyer v. Industrial Commission (Mo. App.) 223 S.W. 2d 835, 839. The evidence must be considered in a light most favorable to the finding together with all reasonable inferences that may be drawn therefrom, but the ultimate responsibility rests upon this court in this case to determine whether the Commission's finding that there was no stoppage of work at respondent's plant because of a labor dispute after July 8, 1950, is supported by competent and substantial evidence upon the whole record. S.S. Kresge Co. v. Unemployment Compensation Commission, 349 Mo. 590, 162 S.W. 2d 838, 840; Section 288.190 RSMo 1949, now Section 288.210 VAMS; Laws 1951, p. 564; Article V, Section 22, Const. of Missouri 1945. To sustain that finding it must appear that there was no substantial diminution of the activities, production or service at respondent's plant after the date mentioned. Section 288.020 (13) RSMo 1949. We think the evidence presented in the record is wholly insufficient to support the finding made.

It is admitted that claimants were respondent's production workers on strike. Respondent was primarily engaged in the [174] production of powdered and frozen eggs approximately two-thirds of its business was egg business and 80 per cent of its egg business was powdered and frozen eggs. One-third of respondent's business was the production of dressed poultry. Clearly, respondent was engaged primarily in production and not in such activities as the buying and selling and handling of hides, wool and mohair. Respondent was not engaged in the furnishing of services. It is admitted that no actual production figures were in evidence, or any evidence expressly dealing with pro-

duction at respondent's plant during the period of the strike. Further the Appeals Referee made no direct finding that there was no substantial diminution of *production* at respondent's plant after July 8, 1950, and no direct finding that any diminution of production was *not* due to the labor dispute. Instead, the Referee found that *"any failure to produce at a normal rate after that time may well have been due to factors other than the labor dispute."* (Italics ours). This finding was insufficient to support the further finding that there was no stoppage of work due to the labor dispute. No issue of credibility is presented since there was no other testimony (other than that reviewed) from which an inference could be drawn to support a finding that there was no substantial diminution of *production* at respondent's plant (the employing unit) because of a labor dispute and, therefore, no "stoppage of work." Appellants say that the facts concerning the strike's effect on respondent's production were peculiarly within the knowledge of respondent, however, such fact did not relieve claimants from the burden of proof resting upon them to avoid the express disqualification provided by the statute. We find no substantial evidence in this record to support a finding that claimants' unemployment after July 8, 1950, was not due to a stoppage of work because of a labor dispute in respondent's plant.

■ Respondent further contends that the Commission's finding that claimants were available for work and had been actively seeking work during the periods covered by their claims is not supported by substantial evidence. Respondent's theory is that the employer did not terminate claimant's employment by obtaining replacements; that claimants remained respondent's employees on strike; that claimants were not unemployed, or the employer-employee relationship terminated during the period of the strike; and that claimants were not available for work elsewhere. Appellants admit that "the mere fact that the claimants were found not to be unemployed due to a 'stoppage of work' which 'exists because of a labor dispute' in respondent's establishment after July 8, 1950, did not, of itself, entitle them to benefits. They still had the burden of establishing that they were available for work within the meaning of Sec. 288.110 RSMo 1949." See Wagner v. Unemployment Compensation Commission, 355 Mo. 805, 198 S.W. 2d 342. Section 288.110 RSMo 1949 (now Sec. 288.040 VAMS) expressly provided that to be eligible for benefits the claimant must be able to work and available for work and further provided that "no person shall be deemed available for work unless he has been actively seeking work."

· The picket line, which was established at the commencement of the strike, was continuously maintained until January 19, 1951, when an agreement was reached between respondent and the Union for the termination of the strike. Appellants summarize this evidence as

follows: "Throughout the existence of the labor dispute, the striking workers devoted varying periods of their time to picket duty, the majority being assigned regular schedules involving their presence at the lot (strike headquarters) for periods of from two to six hours daily. These persons were actually on the picket line for a small portion of the aforementioned periods but customarily remained at or near the lot between turns on the picket line. There was no evidence of any rule or requirement by the Union that the claimants report for picket duty, remain during the entire schedule to which they might be assigned, or remain at headquarters while not actually on the line. It was conceded that the claimants were free to seek work at times when they were not actually doing picket duty."

[175] It was admitted by the agreement which settled the strike on January 16, 1951, that the company "has filled with permanent employees all jobs vacated by said striking employees," but when that was done does not appear from any evidence. It was also admitted that a controversy existed at that time between the respondent and the Union on the issue "as to whether the members of the Union still have the status of employees, or the right of re-employment or re-instatement."

In addition to the above evidence relating to the issues common to all claims, the Appeals Referee and the Commission considered the testimony of the respective claimants concerning their individual efforts to find work during the progress of the strike. This evidence in most instances consisted of completed bi-monthly questionnaires and testimony tending to show claimant would not have refused work, or have been prevented from accepting any offer of suitable work; and that, despite their participation in the picketing, each one was making an independent search and inquiry for work and had registered for work with the public employment office maintained by the Commission. Respondent refers to this evidence on behalf of the several claimants concerning their activities in seeking work as "stereotyped and repetitious."

The Appeals Referee found, and his finding was approved by the Commission: "The evidence establishes that the claimants did not withhold services on June 3, 1950, and thereafter, with any intention of abandoning work. * * * the employer actually terminated the claimants (employment) by obtaining replacements and continuing in production without their services * * * the claimants did not leave work voluntarily * * * the claimants' participation in the labor dispute is not of such a nature as to render the claimants unavailable for work. The picketing duties performed by the claimants are in concert with many other workers * * * by picketing each one represents himself in the dispute with the employer. Virtually all of the workers, who withheld their services after June 3, 1950, have continued to show their interest in the dispute by

participating in the picket line. * * * In the instant case * * * the employer has resumed production without the services of the claimants and actually there is no evidence that the claimants' jobs are vacant. Therefore, in the instant case the claimants' participation in the picket line may constitute evidence of the claimants' willingness to work but under the circumstances does not of itself appear to constitute an active search for work. It does appear, however, that if the claimants did avail themselves of the opportunities they had during the weeks in question to look for another job in the reasonable manner, they may be considered available for work." It will be noted that there is no finding that claimants have been permanently replaced, rather the finding is that "actually there is no evidence that the claimants' jobs are vacant." On the basis of these and the other findings by the Appeals Referee, the claims of claimants for unemployment benefits were allowed.

In support of the contention that there is no substantial evidence to support the Commission's finding that claimants were available for work, the respondent points to the Commission's findings "that the claimants did not withhold services on June 3, 1950, and thereafter, with any intention of abandoning work"; that "virtually all of the workers who withheld their services after June 3, 1950, have continued to show their interest in the dispute by participating in the picket line"; and that "each claimant has, by his persistent interest in the labor dispute and by his participation in the picket line, kept the employer indirectly advised of his continued interest in working after satisfactory negotiations are concluded." Respondent insists that these findings are inconsistent with, contradictory of and destructive of the Commission's finding that claimants were available for work elsewhere. Respondent insists the testimony of the claimants shows they were doing everything in their power to promote, foster and participate in the strike, by picketing and staying around strike headquarters for as much as three hours per day, six and seven days per week and that the evidence clearly shows claimants' predominant interest in the strike rather than in actively seeking bona fide employment elsewhere. Respondent contends that in a legal sense these [176] claimants were not "available for work" while actively participating in the strike against their employer to obtain wages and working conditions satisfactory to them.

Appellants admit that, "In the case of the 'labor dispute', the withdrawal of services is but tentative, with the expectation that the employer-employee relationship will be resumed when the differences between the employees and their employer are ironed out. Thus, the view has been expressed by courts of other jurisdictions having similar statutes * * * that a labor dispute involves only a temporary suspension of the employer-employee relationship, as distinguished from the definite, or unequivocal termination which occurs when a worker

simply quits his job.'' Appellants contend however that ''the test to be applied in determining whether picketing strikers are available for work is whether they are willing to take work, are in a position to accept work, and are actively seeking work''; and that ''the fact of part-time participation in picketing does not in and of itself justify, much less compel, a finding of non-availability for work.''

The circuit court, when ordering the findings and awards of the commission in the several cases reversed, did not find it necessary to expressly rule the question raised by respondent in its petition for review and now urged, as to whether or not a person actively engaged in picketing part of each work day is available for employment and actively seeking employment within the meaning of the act. The trial judge placed his decision on other grounds which we need not consider.

This court in Haynes v. Unemployment Compensation Commission, 353 Mo. 540, 183 S.W. 2d 77, 82, drew the conclusions that, ''in providing that 'an unemployed individual shall be eligible to receive benefits with respect to any week only if the commission finds that * * * he is able to work, and available for work', the Legislature required a sufficient showing of evidence to support a finding by the commission, and a finding by the commission, that the claimant was during said week 'capable of being used to accomplish a purpose' for work; that he was 'at disposal; accessible or attainable' for work; and that he was 'ready, handy, convenient, usable and obtainable' for work.'' See also Donnelly Garment Co. v. Keitel, 354 Mo. 1138, 193 S.W. 2d 577. But, after the decision of the Haynes and Donnelly Garment Co. cases, ''available for work'' was given a more positive construction of meaning by legislative enactment. See Section 288.110 RSMo 1949, amended Laws 1951, p. 564 (new Sec. 288.040 VAMS) which provides ''that no person shall be deemed available for work unless he has been and is actively seeking work.'' ''So it is required that a person able to work (and 'available for work' as defined in the Haynes case) must (in order to be deemed 'available for work' as now construed in accordance with legislative mandate) have been and be 'actively seeking' work, that is, not passively available and waiting for work, but actively 'in search of' work.'' Wagner v. Unemployment Compensation Commission, supra, 198 S.W. 2d 342, 343.

Clearly it is admitted that there was a labor dispute; that claimants, together with all of the employees, went on strike and participated in the picketing at the employer's plant until the labor dispute was settled; that claimants had no intention of abandoning work or terminating their employment, but of resuming it with satisfactory wages and working conditions on settlement of the strike; and that claimants were replaced by respondent's employment of other permanent employees at some time prior to the settlement of the strike. As stated, the Commission held that under these facts

the relationship of employer-employee still existed; that the employment was terminated (at some date) by the act of employer employing others and resuming production without the services of claimants; and that this did not amount to leaving work voluntarily without good cause attributable to claimants' employment. We think the Commission's findings, applicable to all claimants, that "the evidence establishes that the claimants did not withhold services on June 3, 1950 and thereafter, with any intention of abandoning work" was directly contrary to, in conflict with and destructive of the Commission's finding that claimants were unemployed and available [177] for work. In other words, the Commission's holding that claimants remained respondent's employees on strike; and that "the claimants in withholding services from the employer did not intend to abandon work" and the Commission's position that the strike simply suspended the employer-employee relationship and did not terminate it as far as claimants are concerned is directly in conflict with the finding that claimants are unemployed and available for work. It is true that the finding that claimants in withholding their services "June 3, 1950, and thereafter," had no intention of abandoning work or terminating their employment is well supported by evidence. The strike and picketing activities of claimants was clearly directed to obtaining wages and working conditions satisfactory to them. The findings in the individual cases that claimants were actively in search of work is also supported by evidence, if we assume the search was in good faith, as the findings would indicate. But the findings of the Commission are in conflict. A claimant cannot have an intention to stay (retain his employment) and an intention to leave at the same time. So long as claimants had no intention of terminating the employer-employee relationship with respondent and so long as claimants were actively and directly participating in the strike to resume their former positions suspended by the strike, and to resume their employment with wages and conditions of employment satisfactory to them, they were not available for work within the provision of the Missouri Employment Security Law.

In this connection respondent argues that "at all times during the pendency of these claims, claimants were free to return to their work at respondent's plant, if they so desired," and we have noted that there is no finding to the contrary. The finding is that "there is no evidence the claimants' jobs are vacant," but this is not a finding that their positions had been filled.

"The term 'available for work' is not defined in the statute * * * and it is neither necessary nor desirable to attempt an inflexible definition of the term in this case." Wiley v. Carroll (Mo. Sup.), 201 S.W. 2d 320, 321. And see Haynes v. Unemployment Compensation Commission, supra; Wolpers v. Unemployment Compensation Commission, 353 Mo. 1067, 186 S.W. 2d 440, 441. Availability differs

upon the peculiar facts in each case and no set rules can be made to cover the variety of circumstances that may be presented in individual cases. Jacobs v. Unemployment Comp. & Placement, 27 Wash. 641, 179 Pac. 2d 707, 713(6); Leonard v. Unemployment Comp. Board of Review (Ohio) 75 N.E. 2d 567, 568. Clearly the claimant must have a genuine attachment to the labor market and be able, willing and ready to accept suitable work. Reger v. Administrator, Unemployment Comp. Act, 132 Conn. 647, 46 A. 2d 844.

In Milne Chair Co. v. Hake (Tenn.), 230 S.W. 2d 393, where claimants indicated "they would thereafter picket the company's plant, if requested" the court said: "In this situation, we would not be justified in holding, contrary to the findings of the Board, that the short time consumed in picketing makes these people unavailable for employment. The contrary would seem to be the truth. Nor can we assume that any of these employees would either be requested to picket or would continue to serve on the picket line if it interfered with any employment made available." The intention, if any, of claimants to maintain the employer-employee relationship with respondent, as employees on strike, was not considered. In Clinton v. Hake (Tenn.) 206 S.W. 2d 889, where claimants were participating in a labor dispute and employed taking their turns in the picketing activity, the evidence was held sufficient to sustain a finding that claimants were fully employed and not available for work.

We hold that so long as claimants intended to maintain the employer-employee relationship with respondent and resume their positions on settlement of the strike, and so long as their positions were vacant and they were actively participating in the strike, claimants were not available for work elsewhere, as their availability for work was unduly limited, although the formality of an active search for work might appear.

[178] We have examined the other contentions of respondent as urged against the findings and awards of benefits to the claimants, but find them without merit.

■ The judgment in so far as it reverses the findings and awards of the Commission to the several claimants is affirmed, but the cases are remanded to the Commission for amended findings as to the date on which the stoppage of work ended; if prior to the settlement of the strike, when the employer-employee relationship of claimants terminated, whether the claimants were available for work and actively seeking work as herein mentioned, and for other proceedings not inconsistent with the views herein expressed. See Section 288.190.3 RSMo 1949, Section 288.210 VAMS.

All concur.