**TRI–STATE MOTOR TRANSIT COMPA-NY, a corporation, Plaintiff-Appellant,**

v.

**INDUSTRIAL COMMISSION of Missouri, DIVISION OF EMPLOYMENT SE-CURITY, Defendants-Respondents, and**

**George Anglen et al., Defendants.**

**No. 9490.**

Missouri Court of Appeals, Springfield District.

April 12, 1974.

Motion for Rehearing or to Transfer to the Supreme Court Denied May 1, 1974.

Application to Transfer Denied June 10, 1974.

---

Charles White Hess, Linde, Thomson, Van Dyke, Fairchild & Langworthy, Kansas City, for plaintiff-appellant.

Lloyd G. Hanley, Jefferson City, for defendant-respondent Division of Employment Security.

Lloyd G. Poole, Jefferson City, for defendant-respondent Industrial Commission of Mo.

PER CURIAM:

Tri-State Motor Transit Company appeals from the judgment of the Circuit Court of Jasper County affirming the award of the Industrial Commission of Missouri which held that 41 claimants (in what is termed "this representative case") were "eligible for waiting week credit or benefits" under the Missouri Employment Security Law (Ch. 288 RSMo 1969, V.A. M.S.) [1] "for which they claim benefits between December 26, 1970 to and including March 13, 1971."

The employer had a collective bargaining agreement with Teamsters Local 823 covering the wages and working conditions of all its office and maintenance workers and drivers. Claimants are all union members. Negotiations commenced in June 1970 between Tri-State and the union for a new contract when the existing contract expired. The union called a strike September 14, 1970 and placed pickets at Tri-State's premises. The strike was still in progress when the Commission's decision was rendered on April 24, 1972.

1. See Appendix I.

Ere considering Tri-State's points on appeal or recasting the evidence relative thereto, we remind ourselves of the rules governing a judicial review of decisions rendered by administrative agencies. It is aphoristic that the burden of proof was ever upon claimants to establish their rights to benefits [Haynes v. Unemployment Compensation Commission, 353 Mo. 540, 544[1], 183 S.W.2d 77, 80[1] (1944); Rapp v. Industrial Commission of Missouri, 360 S.W.2d 366, 369 (Mo.App. 1962)], and that the Commission, as the trier of the facts, could believe or disbelieve none, all or part of any witness' testimony and draw inferences from facts dissimilar to those which a court on judicial review may have drawn. Cross v. Industrial Commission, 359 S.W.2d 494, 500[7] (Mo.App.1962). "We are authorized to determine whether, upon the entire record, the Commission could reasonably have made the findings and decision under consideration. We may not substitute our own judgment on the evidence for that of the Industrial Commission, but may set aside the Commission's judgment only if it is clearly contrary to the overwhelming weight of the evidence. . . . We must view the evidence, together with all legitimate inferences to be drawn therefrom in the light most favorable to the Commission's decision. . . . The only question here is whether the Commission could have reasonably reached the conclusion it did, even where two possible conclusions may be made upon the evidence." Blackman v. Industrial Commission, Div. of Emp. Sec., 491 S.W.2d 18, 22[1] (Mo. App.1973); Mo.Const. Art. V, § 22, V.A. M.S.

In Producers Produce Co. v. Industrial Commission, 365 Mo. 996, 1011–1012, 291 S.W.2d 166, 176 (banc 1956), it is stated " 'that a labor dispute involves only a temporary suspension of the employer-employee relationship, as distinguished from the definite, or unequivocal termination which occurs when a worker simply quits his job'," (and we add) or is fired. This statement is generally acceptable but not completely true because a labor dispute may or may not produce a suspension of the relationship; it is more accurate to note that the actual suspension of the relationship usually does not occur until the strike is called and the worker responds. Huck v. Industrial Commission, 361 S.W. 2d 332, 336 (Mo.App.1962). "Labor dispute" is not defined in Ch. 288 but § 295.020–5 states: "The term 'labor dispute' shall involve any controversy between employer and employees as to hours, wages, and working conditions. The fact that employees have amicable relations with their employers should not preclude the existence of a dispute among them concerning their representative for collective bargaining purposes." Thus, it does not follow that a suspension of the employer-employee relationship occurs coincidentally with the commencement of the labor dispute—the employees may continue to work although a labor dispute exists. Neither the negotiations between Tri-State and the union which commenced in June 1970 nor the strike called in September 1970 constituted a labor dispute. The negotiations and the strike were simply the result and evidence of a labor dispute already in esse. Also, claimants' unemployment and the stoppage of work in this case did not take place simultaneously with the commencement of the labor dispute, but rather when the effects of the strike caused the unemployment and a substantial diminution in Tri-State's business. Pickman v. Weltmer, 191 Kan. 543, 382 P.2d 298, 303 (1963). Furthermore, "it constitutes participation [in the labor dispute] within the meaning of the Act when claimants either personally or through their chosen representatives [the union] [made] demands concerning wages . . . and enter[ed] into negotiations with the employers for the purpose of enforcing their demands whether by means of a strike or otherwise." Poggemoeller v. Industrial Com'n, Div. of Emp. Sec., 371 S.W.2d 488, 505[13] (Mo.App. 1963).

 Under § 288.040–4(1) [Appendix I], a claimant is ineligible for benefits if his unemployment is due to a stoppage of work caused by a labor dispute in which he is participating, financing or directly interested at the place where he was last employed. It should follow, therefore, that if the stoppage of work is not due to a labor dispute or is due to a labor dispute in which claimant is not participating, financing or directly interested, then the ineligibility provisions of the law would not apply. "Stoppage of Work" is defined in our statute and generally held to refer to the employer's operations, not to the employee's labor or cessation of work by claimants. Meadow Gold Dairies-Hawaii, Ltd. v. Wiig, 50 Haw. 225, 437 P.2d 317, 319 (1968); Magner v. Kinney, 141 Neb. 122, 2 N.W.2d 689, 692[3] (1942); 81 C.J. S. Social Security and Public Welfare § 190, pp. 283–284. In criticism of this it is said such a pronouncement puts the "cart before the horse" by completely ignoring the import of the term "labor dispute" which necessarily implies the existence of the employer-employee relationship, and when that relationship is extinguished the disqualifying provisions of the law become inapplicable [Blakely v. Review Board of Indiana Emp. Sec. Div., 120 Ind.App. 257, 90 N.E.2d 353, 358[6] (1950)]; for example, a permanent replacement by the employer of the striking employee "at once prevents any choice or volition on the part of the worker to return to the job and since it severs the trade dispute as the cause of the unemployment, the disqualification of the section no longer operates." Ruberoid Co. v. California Unemployment Ins. App. Bd., 59 Cal.2d 73, 27 Cal.Rptr. 878, 378 P.2d 102, 103[1] (1963). To us it appears that scant reason for an argument exists because basically the difference of opinion is predicated on an attempt to compare apples (stoppage of work) and oranges (labor dispute) in the abstract rather than on a complimentary dependent basis. It is provided by § 288.040–4(1), that a claimant may effectively terminate his disqualification by obtaining bona fide employment with another employer for the required period and that this serves to completely sever his relationship with the struck employer although the stoppage of work because of a labor dispute still exists at the latter's place of business. Huck v. Industrial Commission, supra, 361 S.W.2d at 336[4]; Evans v. Industrial Commission, 361 S.W.2d 337, 339[1] (Mo.App. 1962). In other words, if there is a real termination of the relationship between the struck employer and the claimant by reason of claimant's bona fide employment with another, the claimant's subsequent unemployment is compensable because it is not due to a stoppage of work which exists because of a labor dispute at the premises where he was formerly employed.[2] There would seem to be no reason why the employer-employee relationship could not also be effectively terminated by the ex parte act of the employer through hiring permanent replacements for the striking workers. Respondents urge that this alone should render the striking employees eligible for benefits although they cite us no Missouri authority to this effect, and we have found none in our independent research. It is unnecessary in this instance that we decide or accept respondents' theory, although the thought is tempting. Rather, we believe it will suffice if we take the safer double track laid out by the Industrial Commission pursuant to the route established in Producers Produce Co. v. Industrial Commission, 281 S.W.2d 619, 624 (Mo.App.1955), as approved by the Supreme Court in the same case, supra, 291 S.W.2d at 171, and adopt the following as the ultimate issue: Whether claimants, who in the first instance were ineligible to receive benefits when their original unemployment was due to a stoppage of work caused by a labor dispute in which they were participating, were later entitled to receive benefits upon the termination of their employment by Tri-State through the hiring of replace-

---

2. This assumes, of course, that unemployment from the second employer did not result from a stoppage of work caused by a labor dispute.

ment workers which resulted in the cessation of the stoppage of work which previously existed due to the labor dispute.

Donald J. Quinn, acting as the "labor attorney" and "chief negotiator" for Tri-State, wrote the following letter dated December 22, 1970, to the Commissioner of "Federal Mediation and Conciliation Service," who by this time had taken control of the negotiations:

"Dear Commissioner O'Connell:

The Tri-State Motor Transit Co. Board of Directors has directed me to negotiate on the question of reinstatement of economic strikers as follows:

Since the economic strike against Tri-State Motor Transit Co. was initiated by Local 823 on September 14, 1970 the company has hired permanent replacements for all of the economic strikers and all available positions have now been filled.

Any contract signed by the company will have to provide that replacements for economic strikers will continue working during the life of the contract.

Economic strikers wishing to return to work unconditionally and writing a letter to the company to that effect will be placed on a preferential list and will be returned to work as vacancies occur in the chronological order of the receipt of their letters.

/s/ Donald J. Quinn".

At a strike negotiation meeting held December 22, 1970, Mr. Quinn "personally handed" the original of the above letter to Commissioner O'Connell and copies thereof to Messrs. Williams & Kitts, officers of the Teamsters Union. In various ways, claimants and other members of Local 823 on strike against Tri-State, became acquainted with the contents of the letter. The interpretation placed on this letter by claimants, as most all testified, was that Tri-State had permanently replaced them with other employees, and that their posi-

tions were no longer available to them unconditionally. Claimants then began seeking work with other employers. As the Commission found, "Most of the claimants herein did not file their claims for benefits until after they had learned that they had been permanently replaced. The claimants herein testified that during the weeks for which benefits were claimed, they contacted prospective employers in a search for either permanent or temporary work. Most of the claimants stated that if the strike is settled satisfactorily and if they are not then employed, they will go back to work for the employer if their positions are then open and available. A number of the claimants are already employed elsewhere."

In explanation of the December 22 letter, supra, Mr. Quinn, its author, testified, in part: "Back in the first or second week in December [1970] in a meeting with Mr. Roy Williams, who conducted the meetings for the union, it was decided that a very critical point had to do with whether or not the company would fire all of its replacement people or whether their decision would be to keep the replacements and to replace the older employees in some fashion. As a result . . . the letter of 12–22–70. The letter indicated that the company had hired permanent replacements for the economic strikers as of that date and that the available positions then had been filled [and that any future contract] would have to provide that replacements for those strikers would continue working during the life of the contract that was to be signed. The third point of the letter being that any of those economic strikers who wanted to return to work all they would have to do would be to write the company and tell them they wanted to return to work and their letters would be assigned a chronological point on a list by their receipt date. . . . Paragraph two of that letter was prepared by me in response to information given to me by the Board of Directors . . . of Tri-State . . . . . As far as this letter is con-

cerned, it was written for the eyes of perhaps four people. It was not a notification by the company to the union that anyone had been terminated, suspended, or otherwise. It simply was a way for the company to let the federal mediator know how far the company would go in replacing the replacements and returning to work all employees who were and are economic strikers . . . . . . the company, as indicated in this letter, had hired permanent replacements for the economic strikers, that all available positions had been filled . . . ."

At the hearing before the appeals referee held on March 16, 1971, George W. Carter, "Senior Vice-President of Operations" for Tri-State, was asked and answered, among others, the following questions:

"Q. Would you say that the operations at Tri-State since the strike have been substantially affected by the strike? A. At the beginning. Q. At the beginning of the strike? A. Yes. Q. And during the year 1971? A. I don't think it has any effect. Q. In other words, you would say the operations at Tri-State are back to normal? Yes. . . . Q. [by the referee] Could you be a little more specific as to what you mean [by] 'At the beginning' . . .? A. Well, September 14, [1970], of course, was the beginning . . . and it curtailed our operations considerably for the first three weeks. . . . After the first three weeks we started gaining our business back and it has continued ever since until the month of February [1971] we had normal operations as far as business was concerned and gross revenue was concerned. . . . there was considerable curtailment between

September 14 and December 31 [1970], put the three months together—two and a half months. . . . there were approximately . . . a little over four hundred [workers who had originally gone on strike]. Q. . . . in December of 1970 did you have four hundred persons working there at your company? A. Yes, we had that many working." The witness went on to relate that in March 1971 the "biggest problem right now is we are turning down more business than we can handle and we don't have enough people to handle it. Q. You need more employees now than you employed prior to this strike? A. That's right." Also, Mr. Carter stated that if the claimants were to report to work on the date of the hearing (March 16, 1971) "he can work." However, the witness further recounted that "If some of these [claimants] would have showed up for work December 22 or December 23 [1970], we may or may not [have] put them back to work . . . .. As of January 1 [1971] if ten people showed up, we may have put five back to work or may not, depending on how they returned to work. . . . I don't remember December 22 whether we could put any of these [claimants] to work that day or not." When asked how long it had been possible for Tri-State to have returned all claimants to work, Mr. Carter replied: "That would be hard to determine exactly . . ., because business wasn't as good a month ago as it is today."

After applications for review had been filed by Tri-State, the Industrial Commission remanded the cause to the appeals tribunal to obtain further information relative to the employer's operations.[3] As a result of this remand, certain data was prepared and presented by Harold F. Nickels, treasurer of Tri-State.[4] However,

---

3. The information sought by the remand order was: "(1). Gross revenue by month for the calendar year 1970. (2). Gross revenue for the month of January and the month of February, 1971. (3). Gross revenue for the month of September, 1970, prior to the fourteenth day of the month. (4). Average number of employees on the payroll for each month of the calendar year 1970. (5). Average number of employees on the payroll for the week ending September 12, 1970. (6). Average number of employees for the week ending September 26, 1970. (7). Average number of employees for each calendar week between October 11, 1970 and February 27, 1971."

4. Tables 1 and 2 of the exhibits are set forth in Appendixes II and III.

in exploring the statistical information, it developed that the figures as to gross revenues and numbers of employees, both before and after the strike, included not only revenues and employees of Tri-State but also revenues and employees of Hughes Transportation and USAC Transport, Inc., each described as being "a division of Tri-State." Revenues and employees of Aero Body Corporation and Parkhill Truck Company, denominated respectively as a "separate corporation" and "a wholly owned subsidiary," and revenues generated by leased operators, were not included in the figures which, according to the exhibit, purported to show only gross revenues and average number of employees of Tri-State. When counsel for claimants undertook by questioning to determine and establish that some of the pre-strike operations of Tri-State were transferred to Parkhill and Aero Body after the strike or were performed by leased operators, he was thwarted by the declaration that "It's the Referee's ruling that he does not have jurisdiction over anything other than what is set out in the order of the remand. Its the Referee's opinion that the Order of Remand does not include that question."

In addition to findings recited above, the Industrial Commission further found that the "evidence shows that by December 22, 1970, the employer hired permanent replacements for all of the claimants and that all of the available positions were filled. The evidence further shows that by January 1, 1971, the employer's operations had become normal. The Commission concluded [sic] that after December 26, 1970, the work stoppage had ended, so that the claimants' unemployment was not due to a stoppage of work which existed because of a labor dispute at the employer's premises. The Commission further finds that during the weeks claimed after December 26, 1970, the claimants were able to work, and actively and earnestly sought work so were available for work. The Commission notes that the employer-employee relationship, which had been suspended by the strike,

was terminated by the employer when the employer hired permanent replacements for the claimants and filled the claimants' positions with such replacements; and that thereafter the claimants were not free to return to their positions if they so desired but could return only as vacancies among the permanent replacements occurred."

The two points relied on by Tri-State in this appeal are that the circuit court's judgment and, in turn, the Commission's decision should be reversed for the reasons that "I . . . claimants did not adduce substantial and competent evidence in the record to prove that their unemployment was not due to a stoppage of work which existed because of a labor dispute at Tri-State" and "II The claimants failed to prove by substantial and competent evidence that (1) they were able to work and available for work as those terms are defined in the Missouri law during the various periods of alleged unemployment, and, (2) jobs with Tri-State were not available to them after December 26, 1970."

■ Unfortunately, in defining "stoppage of work" [§ 288.040–4(2)], the statute employs the imprecise adjective "substantial." How much stoppage of work constitutes a substantial diminution of an employer's business, needs to be judged to ascertain not only when the stoppage of work commenced but when it ended. "Substantial" means "considerable," "ample," "large," "important," and "abundant." "Massive" is given as a synonym. Webster's Third New World Dictionary of the English Language, Unabridged, p. 2280; Webster's New World Dictionary of The American Language, College Ed., p. 1454. This illustrates that it is impracticable for any tribunal to attempt to fix a definite percentage of the diminution of the activities, production or services that could serve to gauge when a stoppage of work started and when it stopped. Of necessity, each case must be judged on its own particular facts. Mountain States Tel. & Tel. Co. v. Sakrison, 71 Ariz. 219, 225 P.2d 707, 712 (1950).

Tri-State's figures [Appendixes II and III] show gross revenues in the 8 full months preceding the strike to be $20,024,031 for a monthly average of $2,503,004. In December 1970 and January and February 1971 the total revenues were $6,295,736 or a monthly average of $2,098,579, which represents a 16.16% diminution in gross revenues. How much of this diminution, if any, is attributable solely to Tri-State's operations or to the operations of Hughes Transportation and USAC Transport, whose revenues are also included in the figures, we do not know. Professor Williams, writing in 8 Vand.L.Rev. 338, 340, said: "While various facts obviously would enter in, the courts tend to concentrate on the diminution of the activities of production in determining the question of existence of a stoppage of work. The critical breaking point would seem to be about 20 to 30 per cent cut in production as being sufficient to establish a stoppage."

 Irrespective of any explanation given of the meaning, intent or purpose of the December 22, 1970, letter written by Tri-State's counsel at the direction of its board of directors, it was not unreasonable for either the Industrial Commission or the claimants to conclude that the letter meant exactly what it said. In addition to this, Mr. Quinn stated as a fact "that the company, as indicated in this letter, had hired permanent replacements for the economic strikers [and] that all available positions had been filled." Considering this with the testimony of Tri-State's senior vice president of operations that the strike had no effect on operations in 1971 and that by February 1971 Tri-State "had normal operations as far as business was concerned and gross revenue was concerned," and coupling this to the foregoing analysis of gross revenues showing only a 16.16% diminution in monthly average gross revenues commencing with December 1970, we cannot say here, as a matter of law, that the Industrial Commission could not have reasonably found and concluded that the stop-

page of work, i. e., a "substantial diminution of the activities, production or services" at Tri-State, terminated on or about December 26, 1970, or that such a finding is clearly contrary to the overwhelming weight of the evidence. A stoppage of work is deemed to have ended when the employer resumes substantially normal operations, and when such a resumption occurs is usually a question of fact for the Industrial Commission. Totorica v. Western Equipment Co., 88 Idaho 534, 401 P.2d 817, 822[4] (1965).

 So long as claimants and Tri-State intended to maintain the employer-employee relationship, though it be relegated to limbo for the duration of the strike, and intended to resume their former positions actively upon settlement of the labor dispute, and so long as claimants' positions were vacant and they were not available for work elsewhere, the claimants could not be deemed available for work within the meaning of the law. § 288.040–1(2); Producers Produce Co. v. Industrial Commission, supra, 291 S.W.2d at 177. However, as specifically found by the Commission, when Tri-State hired permanent replacements for claimants and filled their positions so as to terminate the stoppage of work (all as could be reasonably found from the December 22, 1970, letter, the testimony of Messrs. Quinn and Carter, and the gross revenue figures produced in evidence), the employer-employee relationship ceased and no stoppage of work then existed because of a labor dispute at the premises of Tri-State. When this occurred claimants became available for work and the Commission could, as it did, have reasonably reached the conclusion (without detailing the evidence relative thereto in the 6-volume transcript in this case) that claimants actively and earnestly sought work of available employers. We are not persuaded with the employer's argument that jobs were available to claimants at Tri-State after December 26, 1970. In the first place, such a contention flies in the face of the letter and testimony of Mr. Quinn that all the claimants had been per-

manently replaced by December 22, 1970. The argument is not supported by the equivocal testimony of Mr. Carter that Tri-State "may or may not" have had jobs available after that time and ignores that any rehiring of claimants by Tri-State would necessarily depend upon the condition and fortuity of a vacancy occurring among the workers hired to replace them. The award of the Commission concerned the period of December 26, 1970 to March 13, 1971; the vague announcement by Mr. Carter that Tri-State could return the claimants to work was not made until March 16, 1971, and, of course, an offer cannot be accepted until it has been communicated to the offeree. ACF Industries, Inc. v. Industrial Commission, 320 S.W.2d 484, 492[10] (Mo. banc 1959). Even if the announcement could be said to attain the dignity of an offer, it came too late.

Having concluded that the findings of the Commission are not clearly contrary to the overwhelming weight of the evidence and that it could have reasonably reached the conclusions that it did, the judgment nisi stands affirmed.

All concur.

### APPENDIX

### I

Sec. 288.040 before the 1972 amendment provided:

"1. A claimant who is unemployed and has been determined to be an in-sured worker shall be eligible for benefits for any week only if the deputy finds that . . . (2) He is able to work and is available for work; provided, however, that no person shall be deemed available for work unless he has been and is actively and earnestly seeking work; . . . 4. (1) A claimant shall be ineligible for waiting week credit or benefits for any week for which the deputy finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute in the factory, establishment or other premises in which he is or was last employed; provided, that in the event he secures other employment from which he is separated during the existence of the labor dispute, he must have obtained bona fide employment as a permanent employee for at least the major part of each of two weeks in such subsequent employment to terminate his ineligibility; . . . and provided further, that this subsection shall not apply if it is shown to the satisfaction of the deputy that (a) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work . . . ; (2) 'Stoppage of Work' as used in this subsection means a substantial diminution of the activities, production or services at the establishment, plant, factory or premises of the employing unit."

II

Table 1

TRI–STATE MOTOR TRANSIT CO.
JOPLIN, MISSOURI

1970

| Month | Gross Revenues | Average number of Tri-State Employees | |
|---|---|---|---|
| January | $2,684,273 | 640 | |
| February | 2,422,615 | 659 | |
| March | 2,479,501 | 640 | |
| April | 2,784,046 | 614 | |
| May | 2,423,226 | 584 | Pre-strike |
| June | 2,477,530 | 564 | Average – 580 |
| July | 2,414,035 | 537 | |
| August | 2,338,805 | 518 | |
| September | 1,981,577 | 468 | Strike |
| October | 1,745,788 | 300 | |
| November | 1,573,812 | 326 | Strike |
| December | 2,092,366 | 333 | Average – 320 |

1971

| Month | Gross Revenues | Average number of Tri-State Employees |
|---|---|---|
| January | $2,077,803 | 318 |
| February | 2,125,567 | 325 |

III

Table 2

Gross estimated revenues for the period September 1, 1970
through September 13, 1970 $777,000

Average number of employees on the payroll for the week
ending September 12, 1970 510

Average number of employees for the week ending September
16, 1970 391

Average number of employees for each calendar week between
October 11, 1970 and February 27, 1971:

| Week ending: | Week No. | Average Number Tri-State Employees |
|---|---|---|
| 10–10–70 | 41 | 309 |
| 10–17–70 | 42 | 312 |
| 10–24–70 | 43 | 317 |
| 10–31–70 | 44 | 333 |
| 11–7–70 | 45 | 331 |
| 11–14–70 | 46 | 341 |
| 11–21–70 | 47 | 317 |
| 11–28–70 | 48 | 315 |
| 12–5–70 | 49 | 314 |
| 12–12–70 | 50 | 329 |
| 12–19–70 | 51 | 353 |
| 12–26–70 | 52 | 336 |
| 1–2–71 | 1 | 323 |
| 1–9–71 | 2 | 306 |
| 1–16–71 | 3 | 325 |
| 1–23–71 | 4 | 320 |
| 1–30–71 | 5 | 321 |
| 2–6–71 | 6 | 324 |
| 2–13–71 | 7 | 331 |
| 2–20–71 | 8 | 321 |
| 2–27–71 | 9 | 324 |

Average number of Tri-State employees 10–10–70 to 2–27–71, was 324
employees.