210 A.2d 867.
ESTELLE FONTAINE *vs.* BOARD OF REVIEW OF DEPARTMENT OF EMPLOYMENT SECURITY *et al.*
BEATRICE VERRIER *vs.* SAME.
PHILOMENA TIVEY *vs.* SAME.

JUNE 17, 1965.

PRESENT: Condon, C. J., Roberts, Paolino, Powers and Joslin, JJ.

38

PAOLINO, J. These three petitions were brought in accordance with the provisions of G. L. 1956, §28-44-52, to review the decision of the respondent board denying the claim of each petitioner for benefits under the employment security act, G. L. 1956, chaps. 42-44 of title 28. After a hearing before a justice of the superior court a decree was entered in each case reversing the decision of the board of review. The cases are here under the provisions of §28-44-55 on the respondents' appeal in each case from such decree.

Since all three appeals raise identical issues, the parties have briefed and argued them together, with the agreement that our decisions in these cases shall apply to the applications of nine co-employees who have similar claims. The

appellants are the board of review of the department of employment security, the director of employment security, and Supreme Dyeing & Finishing Corporation. For convenience we shall sometimes hereinafter refer to them as the board, the director and the employer respectively.

The following sections of the act are pertinent here:

"28-44-16. Labor disputes.—An individual shall not be entitled to benefits except for unemployment which continues subsequent to six (6) weeks in addition to his waiting period, if he became unemployed because of a strike or other industrial controversy in the establishment in which he was employed; provided, that this section shall not apply if it is shown to the satisfaction of the director that the claimant is not a member of the organization or group responsible for the stoppage of work, and is not participating in or financing or in any way directly interested in the labor dispute which caused the stoppage of work."

"28-44-17. Voluntary leaving without good cause.— On and after November 16, 1958, an individual who leaves work voluntarily without good cause shall be ineligible for waiting period credit or benefits until he establishes to the satisfaction of the director that he has subsequent to such leaving had at least four (4) weeks of work and in each of said four (4) weeks has had earnings of twenty dollars ($20.00) or more * * *."

"28-44-54. Scope of judicial review—Additional evidence—Precedence of proceedings.—The jurisdiction of the reviewing court shall be confined to questions of law, and, in the absence of fraud, the findings of fact by the board of review, if supported by substantial evidence regardless of statutory or common law rules, shall be conclusive. * * *"

The twelve claimants involved in these cases were employed by the Supreme Dyeing & Finishing Corporation at its plant in West Warwick. As a result of an incident which occurred on July 15, 1963, claimants applied for unemployment benefits under the act. Their claims were denied by the director on the ground that they had left work volun-

tarily without good cause and were therefore subject to the penalty provisions prescribed in §28-44-17. The claimants thereupon filed appeals with the board. The employer, by counsel, entered an appearance with the board.

At the hearing before the board, claimants contended that the facts established a strike or other labor controversy within the meaning of §28-44-16 and that therefore they were subject to the penalty period therein prescribed. After hearing the appeals, the board, by majority vote, sustained the action of the director. Their decision contains certain findings of fact in each case, a copy of which we have appended to this opinion for a clearer understanding of the issues in these actions.

On the basis of such findings the board, with one member dissenting, held that there was no strike or industrial controversy involved and that in their opinion claimants left work voluntarily without good cause and were subject to the penalty provided by §28-44-17.

The claimants thereupon filed the instant petitions for judicial review in accordance with the provisions of §28-44-52. At the hearing in the superior court the parties stated that they accepted the board's findings of fact, with one exception. Counsel for claimants in substance stated that he challenged the board's statement that "each of these claimants individually decided to quit work and to withhold their services as a means of bringing pressure on the employer to recognize their complaints" if the board meant "that the employee's act and intent did not encompass group rather than individual action * * *."

In considering these petitions the trial justice, as required by §28-44-54, accepted the board's findings of fact as conclusive and confined his consideration to the questions of law flowing therefrom. He thereafter entered a decision and a decree based thereon holding that the action of the claimants in law constituted group action and established

a "strike" and an "industrial controversy" within the meaning of §28-44-16.

The first question to be decided is whether such holding is correct in law.

The word "strike" has been defined in many cases and by many authorities. In employer-employee relationships the word in general connotes a controversy of some degree where there is a cessation of work by employees in an effort to get compliance with demands made on their employer. See the following cases for definitions of the word strike.

In *Magner* v. *Kinney*, 141 Neb. 122, 127, strike is defined as follows: " 'A strike is cessation of work by employees in an effort to get for the employees more desirable terms. * * *' *Iron Molders' Union* v. *Allis-Chalmers Co.*, 166 Fed. 45, 20 L.R.A. n.s. 315."

In *Walgreen Co.* v. *Murphy*, 386 Ill. 32, 36, strike is defined as follows: "A strike in the labor sense is generally defined as a stoppage of work by common agreement of a body of workingmen for the purpose of obtaining or resisting a change in the conditions of employment."

In *Deshler Broom Factory* v. *Kinney*, 140 Neb. 889, 892, strike is defined as follows: "A strike, in the common acceptance of the term, is the act of quitting work by a group of workmen for the purpose of coercing their employer to accede to some demand they have made upon him, and which he has refused."

See also 83 C.J.S. Strike, p. 523.

We hold that the facts found by the board established in law an "industrial controversy" between claimants and their employer, and their action in staying away from their work during the period in question constituted a "strike" within the meaning of §28-44-16.

This conclusion is supported by the board's findings that claimants had made known to their employer certain complaints related to their employment; that the employer

had done nothing about the same; and that they stayed away from work as a means of putting pressure on their employer at a time they thought such action might compel compliance with their demands. It is clear from the board's findings that claimants decided to stay away from their work as a means of bringing pressure on their employer to comply with their complaints. In the circumstances we do not deem it necessary to consider the board's further finding that "Secondarily, the claimants also felt that it was not right to cross any picket line * * *." On the view we take this secondary finding does not detract from their real purpose in staying away from their work.

Having decided that there was a strike and industrial controversy, it became necessary for the trial justice to decide an issue which the board did not reach, namely, whether claimants were excepted from the penalty provisions prescribed by the proviso in §28-44-16. This section provides in substance that claimants who are unemployed because of a strike or other industrial controversy in the establishment in which they are employed are subject to a six-week penalty in addition to their waiting period unless they are excepted by the proviso therein which reads as follows: "* * * provided, that this section shall not apply if it is shown to the satisfaction of the director that the claimant is not a member of the organization or group responsible for the stoppage of work, and is not participating in or financing or in any way directly interested in the labor dispute which caused the stoppage of work."

On this issue he held that the penalty provisions of that section apply only when there is a "stoppage of work" at the establishment at which claimants are employed. In reaching this conclusion he stated that he was adopting the interpretation given to the proviso by the board in a case before it in 1961 where the board's decision contained the following language: "What the legislature is saying, there-

fore, is that even though the claimant may be a member of the union which strikes a plant and is participating in this strike or financing it or otherwise primarily interested in it, if there is no stoppage of work at the plant the penalty provisions of 28-44-16 are not to be imposed upon him."

In accordance with such interpretation he concluded:

"* * * that if during the course of the running of the period of delay provided in the statute, Section 28-44-16, the stoppage of work previously caused by the striking employees ended, then the period of delay for receiving unemployment compensation should end also. If it is determined that the strike no longer effects a stoppage of work because the jobs of the striking employees have been filled by others, the employee cannot be considered to have continued in the voluntary cessation of work. Therefore, reason and logic indicate that a liberal construction of the unemployment compensation statute to effect its purpose would require the payment of unemployment compensation especially in a case where the employment appears to have been brought to a termination by the act of the employer."

On the basis of the testimony before the board and also because there was no evidence to negate the fact that by July 31, 1963 claimants were entirely replaced at the plant and they were no longer responsible for any stoppage of work, he held that they were entitled to benefits from that date forward, but not for the period of July 15, 1963 to July 30, 1963 because there was a partial stoppage of work during that period and because the employees involved in these cases were members of the group responsible for such stoppage of work. He thereupon entered a decree grounded upon the findings contained in his decision.

Although the board made no findings with respect to the question of stoppage of work, the facts stated by the trial justice with relation to such issue accord with the testimony before the board. There is no evidence of a complete stoppage of work at the employer's plant, but there is tes-

timony that the action of claimants affected the operation of the employer's plant until they were replaced by other employees.

The question to be decided is whether the trial justice's interpretation of the proviso truly reflects the legislative intent expressed by the language therein. In view of the general policy and basic purpose of our employment security act as expressed in §28-42-2, see *Harraka* v. *Board of Review of Department of Employment Security*, 98 R. I. 197, 200 A.2d 595, we hold that the phrase "stoppage of work," as used in §28-44-16, refers to the employer's stoppage of work, and a finding that such stoppage of work exists is a condition precedent to the imposition of the penalty provisions of that section. See *Lawrence Baking Co.* v. *Unemployment Compensation Commission*, 308 Mich. 198, where the court said at pages 208 and 212: " * * * the basic purpose of the unemployment compensation law is to afford protection against the hazard of unemployment * * * employees are disqualified if the labor dispute results in a stoppage of the employer's work, and they are not disqualified if the labor dispute does not result in such stoppage."

And in *Magner* v. *Kinney, supra,* at page 130, "if those leaving work are immediately replaced, or if the dispute does not otherwise interfere with production or operation and these are not diminished, there is no stoppage of work and hence no disqualification." See also *Sakrison* v. *Pierce*, 66 Ariz. 162; *Robert S. Abbott Publishing Co.* v. *Annunzio*, 414 Ill. 559; *Adomaitis* v. *Director of the Division of Employment Security*, 334 Mass. 520.

We have carefully considered all of the contentions made by the respondents under their reasons of appeal, even though not specifically referred to by us. We acknowledge the force of their arguments, but we are not convinced by

them. We find no error in the decree entered by the trial justice.

In each case the respondents' appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

ROBERTS, J., concurs in the result.

## APPENDIX

"This claimant is one of twelve former employees of a lace dyeing and finishing company located in a suburban town. It is agreed by the parties, and this agreement is supported by the testimony, that the issue with reference to each of these twelve employees is the same and that for all pertinent purposes the factual situations and legal rights' of each of these employees are identical. There is little disagreement as to the facts. On July 15, 1963, eight of the claimants upon reporting for work at the employer's plant shortly before 8:00 a.m. found a picket line formed in front of the plant. The pickets were not fellow-employees of the claimants and claimants did not know who they were. There was no strike or industrial dispute at the plant. Claimants were not members of any union and no union existed at the plant. However, at a lace manufacturing plant in a nearby town there was an industrial dispute involving a lace maker's union. This industrial dispute had been going on for some little time and its existence was known to the general public and to the claimants. The employer of the claimants was not a lace manufacturer. The lace manufacturing plant in the adjoining town was not owned or operated directly or indirectly by the claimant's employer and had no connection whatever with the employer. In fact the pickets which the claimants observed when they came to work were not employees of or in any way connected with claimant's employer and were complete strangers to the employer. They were probably members of the striking union at the lace manufacturing plant in the adjoining town. Upon observing the picket line at about 8:00 a.m. on July 15, 1963, the claimants adjourned to

a nearby parking lot and decided that the existence of the picket line indicated that their employer was in some sort of potential labor trouble and that this would be a good time for them to stay away from work and, utilizing the leverage of their employer's apparent trouble, to take the opportunity to straighten out with the employer some of their complaints or 'gripes' connected with lay-offs, seniority, differences in pay for the same work, blue cross benefits, etc. which had previously been made known to the employer but without resulting action on his part. The validity of these complaints or 'gripes' is not here pertinent. The pertinent and undisputed facts are that after discussion each of these claimants *individually* decided to quit work and to withhold their services as a means of bringing pressure on the employer to recognize their complaints. (italics ours) Secondarily, the claimants also felt that it was not right to cross any picket line, although they were unanimous in testifying that they were not afraid to do so and that there was no violence or threat of violence by the pickets or anyone. Later in the morning of July 15, 1963, one of the claimants who had been supposed to report for work at 8:00 a.m. came to the plant, saw the picket line, returned home and then later in the day talked with the original eight claimants and decided that she would side with them and would not go to work. Another claimant was out ill on July 15, 1963. She was able to return to work by July 17, 1963, but refrained from doing so because she heard of the picket line, conferred with the other claimants and also decided she would not go to work and would side with them in staying away from work. The remaining two claimants similarly stayed away from work after conferring with the other claimants so that there were twelve in all who took this action. * * * The employer had a total of thirty employees. All of these employees except the claimants continued to work and pass through the picket line daily. On July 16, 1963, claimant's foreman personally contacted each of the claimants at their homes and requested them to return to work. He offered automobile transportation into the plant and suggested their applying for membership in

a nationally known labor union (not the one involved in the strike at the neighboring lace works, whose members were doing the picketing). However, claimants each decided not to return to work and refused the employer's invitation to do so. The employer testified that he wanted claimants to come back to work and that he regarded them as valuable, experienced help and that he sent his foreman to see if he could get them to return. Upon the claimants' continued refusal to return to work by the end of the week the employer gradually filled their jobs and their jobs were filled between July 22, 1963 and July 31, 1963. Claimants could see new people going into the plant and accordingly deduced that new employees had been hired to fill their jobs. On July 31, 1963, the twelve claimants returned to the employer's plant and applied for re-employment. Their re-employment was refused because their jobs had been filled between July 22, 1963 and July 31, 1963. Upon being refused work the claimants then joined the picket line which prior to that time had not contained any employees of their employer. In the same building with the employer's plant there was also another company engaged in lace manufacturing which was affiliated with the employer. However, none of the employees of this company were on the picket line and the company was in a different type of business from that of the employer. The employer testified that he had never had any negotiations or discussions with any union and that it was not until July 31, 1963 that he knew 'the claimants had joined a lace union.' Upon receipt of the claimants' claim for Employment Security Benefits the Director determined that the claimants had left work voluntarily without good cause and were, therefore, subject to the penalty imposed by section 28-44-17. At the hearing of their appeals before the Board the claimants, for the first time on the record, made the contention that their unemployment was not due to their having voluntarily left work but was due to a strike or labor controversy within the meaning of section 28-44-16 and that they were, therefore, subject to the penalty, if any, imposed by that section."

*Adler, Pollock & Sheehan, William J. Sheehan,* for petitioners.

*Aaron S. Helford,* for respondent Board of Review.

*Goldberg & Goldberg, Leo M. Goldberg, Francis J. Barlow,* for respondent Supreme Dyeing & Finishing Corporation.