EMPLOYMENT SECURITY ADMINISTRATION *v.*
BROWNING-FERRIS, INC.

[No. 65, September Term, 1981.]

*Decided January 11, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Dorothy A. Beatty, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Amy Scherr, Assistant Attorney General,* on the brief, for appellant.

*Benjamin E. Goldman,* with whom were *Robert L. Bodansky, Jay P. Krupin* and *Feldman, Krieger, Sheehan, Goldman & Tish* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court. SMITH, J., dissents and filed a dissenting opinion at page 530 *infra.*

This case involves claims for unemployment benefits filed by a number of former employees of Browning-Ferris, Inc. (BFI) who, beginning July 6, 1979, participated in a strike against their employer as a result of a labor dispute. Primarily at issue is whether, under the Maryland Unemployment Insurance Law (the Act), Maryland Code (1957, 1979 Repl. Vol.), Art. 95A, the employees are disqualified from receiving unemployment benefits, even though the strike did not substantially curtail BFI's work operations. The answer to this question turns on the proper interpretation of a provision in § 6 (e) of the Act relating to whether the claimants' unemployment was due "to a stoppage of work, other than a lockout, which exists because of a labor dispute . . . ."

I

The Act was passed by the General Assembly in 1936 to alleviate the consequences of widespread involuntary unemployment caused by the depression. *Sec., Dep't of Human Res. v. Wilson,* 286 Md. 639, 409 A.2d 713 (1979); *Waters v. Unemployment Ins. Fund,* 220 Md. 337, 152 A.2d 811 (1959); *Saunders v. Unemp. Comp. Board,* 188 Md. 677, 53 A.2d 579 (1947). Section 2 of Art. 95A entitled "Declaration of policy" recites that economic insecurity due to unemployment is a serious menace to the general welfare of the people; that legislation is required to prevent the spread of involuntary unemployment and to lighten its burden upon the unemployed worker and his family; that the achievement of security against involuntary unemployment requires the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment; and that there must be "the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own." The Act, which is administered by the Employment Security Administration under the direction and supervision of an Executive

Director and a Board of Appeals, requires employers to contribute to an Unemployment Insurance Fund in amounts calculated in accordance with various provisions of the law. The schedule of employee benefits payable from the Fund is determined by provisions set forth in § 3 of the Act. Section 4 of the Act outlines various conditions which must be met for an individual to be eligible for benefits. Subsection (a) requires that the individual register for work, and continue to report at an employment office in accordance with prescribed regulations; § 4 (b) requires that the individual make a claim for benefits, again following prescribed regulations; § 4 (c) requires, with some exceptions not here relevant, that an individual be "able to work" and "available for work"; and § 4 (d) lists the minimum total wages which the individual must have earned in order to be eligible for benefits.

Section 6 provides that an individual "shall be disqualified for benefits" for various reasons: § 6 (a) — for leaving work voluntarily without good cause; § 6 (b) — where unemployment is due to the employee's discharge for gross misconduct connected with his work; § 6 (c) — where unemployment is due to discharge or suspension as a disciplinary measure connected with the employee's work; § 6 (d) — where the employee fails, without good cause, to apply for or accept available, suitable work.

Section 6 (e) sets forth the conditions under which an employee who participated in a labor dispute is disqualified for unemployment benefits:

> "For any week with respect to which the Executive Director finds that his unemployment is due to a stoppage of work, other than a lockout, which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed . . . ." [1]

---

1. The § 6 (e) disqualification does not apply, however, where the individual can show that

"(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

## II

The claimants, all members of a labor union, were employed by BFI in various capacities as truck drivers, heavy equipment operators and maintenance personnel. The collective bargaining agreement between the employees' union and BFI expired by its terms on July 1, 1979. Negotiations between the parties continued past the expiration date but no agreement had been reached by July 6, 1979. On that date a strike was authorized by the union membership and picketing of BFI's premises commenced.

After the strike began, claims for unemployment benefits under the Act were filed by the striking employees. A Special Examiner of the Employment Security Administration conducted a hearing on the employees' claims and concluded from the evidence that there had been some disruption of BFI's operations during the first two days of the strike but that thereafter "the Employer quickly returned to operations of 90 to 100% of prestrike activity" through utilization of management personnel, replacement employees and employees from other divisions of the company. The examiner found that by the end of August, 1979, all of the striking employees had been replaced and there was no longer work available for them at BFI's premises; that the claimants continued to strike and to picket the employer; and that the claimants did not actively seek other employment. The examiner held that the claimants were disqualified from receiving unemployment benefits under § 4 (c) of the Act because they were not available for work and were not actively seeking employment, as required by that subsection. The examiner concluded that although the

---

(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; provided, that if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purposes of this subsection, be deemed to be a separate factory, establishment, or other premises."

claimants were involved in a labor dispute, it did not culminate in a work stoppage at the employer's premises. He held that the claimants were not, therefore, disqualified from receiving benefits under § 6 (e) of the Act "because there has not been a work stoppage at the premises of the Employer." The examiner said that the claimants, having been replaced by BFI, would become eligible for unemployment benefits once they made themselves available for full-time work and conducted an active search for work. The examiner explained that the claimants' unemployment "is not due to participation in a strike, but due to a lack of work [for them] at the premises of the Employer."

The Board of Appeals agreed with the examiner's factual findings and with his recommended disposition of the case. The Board concluded that while the claimants were disqualified from receiving unemployment benefits under § 4 (c) of the Act, there must be "a substantial work stoppage at the premises at which the strikers were last employed in order to constitute a labor dispute within the meaning of Section 6 (e) of the Law." Since the evidence showed that there was never a substantial work stoppage at BFI's premises, the Board held that the § 6 (e) disqualification did not apply to the claimants.

On appeal to the Circuit Court for Montgomery County, BFI contended that the Board erred in determining that the striking employees were not disqualified for benefits under § 6 (e). BFI maintained that the phrase "stoppage of work" in § 6 (e) refers to cessation of work by the employee. It argued that the legislative declaration of policy, set forth in § 2 of the Act, in effect creates a general voluntariness disqualification which is incorporated into § 6 (e), so that all employees who "voluntarily" stop work to participate in a strike are ineligible for unemployment benefits. The court (Sanders, J.), agreeing with BFI, held that the phrase "stoppage of work" as used in § 6 (e) meant the cessation of work by the striking employees, and not by the employer. It said:

"The declaration of policy (Art. 95A, §2) of the Law states that the public policy of this State is to provide unemployment insurance benefits for those persons unemployed through no fault of their own. Consistent with this declared policy are the provisions of §6(e) previously cited, which deny such benefits to individuals whose unemployment is due to a stoppage of work which exists because of a labor dispute at the place of employment. The clear and unambiguous language of the statute denies benefits to those engaged in a labor dispute who choose not to work."

The court concluded that the striking employees were disqualified from receiving benefits under § 6 (e) because they were involved in a labor dispute and voluntarily chose not to work. The Employment Security Administration appealed to the Court of Special Appeals. We granted certiorari prior to decision by that court to determine the proper construction of § 6 (e) of the Act.

## III

Section 6 (e) was patterned after a provision in the federal Social Security Draft Bill for unemployment compensation prepared by the Committee on Economic Security in 1936, as were the labor dispute disqualification provisions of thirty-three other states.[2] As one commentator has noted:

---

2. The Social Security Board was established under the provisions of H.R. 7260, approved by the 74th Congress on August 14, 1935 (49 Stat. 620), to provide for the general welfare by enabling the states, *inter alia,* to make adequate provision for the administration of their unemployment compensation laws. The Board was charged with the duty of studying and making recommendations as to the most effective methods of providing economic security through social insurance and as to legislation and matters of administrative policy concerning unemployment compensation. The Committee on Economic Security was established under the provisions of Executive Order 6757, dated June 29, 1934. *See* M. Shadur, *Unemployment Benefits and the Labor Dispute Disqualification,* 17 Univ. of Chicago L. Rev. 294, 295 (1950).

"Like most other aspects of the Draft Bill, the stoppage of work requirement had its origin in the British Unemployment Insurance Acts. When this country's fifty-one statutes were adopted, the phrase had long since acquired a settled construction from the British Umpires as referring 'not to the cessation of the workman's labour, but to a stoppage of the work carried on in the factory, workshop or other premises at which the workman is employed.' " [3]

In *Saunders v. Unemp. Comp. Board,* 188 Md. 677, 57 A.2d 579 (1947), we observed that these British Umpire decisions have precedential value because they are final, and because of the well-established rule that the construction of a copied statute, such as the British Unemployment Insurance Acts, is intended to be the construction of the copying act, *i.e.,* the Maryland Unemployment Insurance Law, *id.* at 688 citing *Lavender v. Rosenheim,* 110 Md. 150 at 156, 72 A. 669, 132 Am. St. Rep. 420; *Heyn v. Fidelity Trust Company,* 174 Md. 639 at 658, 197 A. 292. *Saunders* involved claims by striking employees for unemployment benefits from the time the strike terminated to the day the employer was able to resume operations and recall the employees to work. The claimants there argued that the phrase "stoppage of work" referred to a work stoppage by the employee and that once the strike ended, and the employee was willing to return to work, there was no longer a work stoppage and the employee was, therefore, no longer disqualified for benefits. The Court noted that an agreement existed between the employer and the union that the striking employees would be reemployed as soon as the ordinary resumption of operations would permit. The Court observed that a work stoppage at the employer's premises may continue for a period after the strike is ended because of the effect of the strike on the

---

**3.** *See* Shadur, *supra* note 2 at 308, citing Ministry of Labour, Analytical Guide U.I. Code 7, Part III, § 43 (1939 ed.); Brit. Ump. 1480/1927, BU-495 (1927); Brit. Ump. 609, BU-493 (1921).

employer's operations. In addressing the merits of Saunders' claim for benefits, the Court focused on whether the work stoppage resulted from the strike or from factors unrelated to the strike, *i.e.,* the lingering effects of the strike on the employer's ability to resume operations. The Court found that the unemployment was due to the latter cause and denied Saunders' claim. While the Court found it unnecessary to reach the question of whether the phrase "stoppage of work" in what is now § 6 (e) of the Act always means stoppage of the employer's operation, we stated that "the English decisions are persuasive." *Id.* at 688.

Twenty-two states have held that the phrase "stoppage of work," in the context of its usage in statutory provisions similar to § 6 (e) of the Act, refers to a curtailment of the employer's operations, and not to the cessation of work by the employees.[4] The appellate courts of only two states — the Supreme Court of Oklahoma and an intermediate appellate court in Pennsylvania — have taken a contrary

---

4. *See* Sakrison v. Pierce, 66 Ariz. 162, 168, 185 P.2d 528, 532 (1947); Monsanto Chemical Co. v. Commr. of Labor, 229 Ark. 362, 364, 314 S.W.2d 493, 495 (1958); M. A. Ferst Ltd. v. Huiet, 78 Ga. App. 855, 858, 52 S.E.2d 336, 339 (1949); Inter-Island Resorts v. Akahane, 46 Hawaii 140, 148, 377 P.2d 715, 720 (1962); Totorica v. Western Equipment Co., 88 Idaho 534, 541, 401 P.2d 817, 821 (1965); Abbott Publishing Co. v. Annunzio, 414 Ill. 559, 569, 112 N.E.2d 101, 106 (1953); Carnegie-Ill., etc. v. Review Board, etc., 117 Ind. App. 379, 391, 72 N.E.2d 662, 667 (1947); Pickman v. Weltmer, 191 Kan. 543, 548, 382 P.2d 298, 303 (1963) (by implication); Bilodeau et al. v. M.E.S.C., 153 Me. 254, 260, 136 A.2d 522, 526 (1957); General Electric Co. v. Director of the Division of Employment Security, 349 Mass. 358, 363, 208 N.E.2d 234, 237 (1965); Westinghouse Broadcasting Co. v. Director of the Division of Employment Security, 1979 Advance Sheets 1221, 389 N.E.2d 410, 412 (1979); Lawrence Baking Co. v. Unempl. C.C., 308 Mich. 198, 207, 13 N.W.2d 260, 263 (1944); Producers Produce Co. v. Industrial Commission, 365 Mo. 996, 1005, 291 S.W.2d 166, 171 (1956); Continental Oil Co. v. Board of Labor Appeals, 178 Mont. 143, 148, 582 P.2d 1236, 1240 (1978); Magner v. Kinney, 141 Neb. 122, 129, 2 N.W.2d 689, 693 (1942); Legacy v. Clarostat Mfg. Co., 99 N.H. 483, 486, 115 A.2d 424, 426 (1955); Ablondi v. Board of Review, 8 N.J. Super. 71, 76, 73 A.2d 262, 265 (1950); Albuquerque-Phoenix Exp., Inc. v. Employment S.C., 88 N.M. 596, 600, 544 P.2d 1161, 1165 (1975); In Re Steelman, 219 N.C. 306, 312, 13 S.E.2d 544, 548 (1941); Fontaine v. Bd. of Review, Dept. of Emp. Sec., 100 R.I. 37, 44, 210 A.2d 867, 871 (1965); Shell Oil v. Brooks, 88 Wash.2d 909, 912, 567 P.2d 1132, 1134 (1977); Gas Company v. Hatcher, 147 W. Va. 630, 638, 130 S.E.2d 115, 120 (1963).

position.[5] The Oklahoma decision has been subjected to severe criticism,[6] and that state's statute was amended in conformity with the majority construction after the opinion was rendered. The Supreme Court of Pennsylvania has not yet ruled on the issue, and we note that that state's intermediate courts are divided on the question.[7]

Even without the compelling weight of English and American precedents, we are convinced that the phrase "stoppage of work" in § 6 (e) refers to the curtailment of the employer's operations. To interpret "stoppage of work" as cessation of work by the individual employee would make

---

**5.** *See* Board of Review v. Mid-Continent Pet. Corp., 193 Okl. 36, 39, 141 P.2d 69, 71 (1943); Unemp. Comp. Bd. Review v. Tickle, Aplnt., 19 Pa. C. 550, 559, 339 A.2d 864, 869 (1975).

**6.** *See* Saunders v. Unemployment Compensation Board, 188 Md. 677, 683, 53 A.2d 579, 582 (1947); Sakrison v. Pierce, 66 Ariz. 162, 167, 185 P.2d 528, 532 (1947); Monsanto Chemical Co. v. Commr. of Labor, 229 Ark. 362, 364, 314 S.W.2d 493, 495 (1958); M.A. Feist Ltd. v. Huiet, 78 Ga. App. 855, 858, 52 S.E.2d 336, 339 (1949); Inter-Island Resorts v. Akahane, 46 Hawaii 140, 150, 377 P.2d 715, 721 (1962); Totorica v. Western Equipment Co., 88 Idaho 534, 540, 401 P.2d 817, 820 (1965); Abbott Publishing Co. v. Annunzio, 414 Ill. 559, 570, 112 N.E.2d 101, 107 (1953); Lawrence Baking Co. v. Unempl. C.C., 308 Mich. 198, 211, 13 N.W.2d 260, 264 (1944); Continental Oil Co. v. Board of Labor Appeals, 178 Mont. 143, 148, 582 P.2d 1236, 1240 (1978); Albuquerque-Phoenix Exp., Inc. v. Employment S.C., 88 N.M. 596, 601, 544 P.2d 1161, 1166 (1975).

**7.** The Pennsylvania Supreme Court indicated in dicta in Melchick Unemployment Compensation Case, 396 Pa. 560, 564, 154 A.2d 875, 876 (1959), that it might construe "stoppage of work" as referring to the employer in the context of Section 402(d) of the Pennsylvania Unemployment Compensation Law (the Pennsylvania labor dispute disqualification provision). However, it was not required to construe the phrase in that case. As one commentator has noted: "The Pennsylvania courts have not adopted any definite standard as to stoppage of work." Reuben and Schuckers, *The Labor Dispute Disqualification of the Pennsylvania Unemployment Compensation Law,* 50 Temple L.Q. 211, 217 (1977). *Compare* Unemp. Comp. Bd. Review v. Tickle, Aplnt., *supra, with* Conroy Unempl. Compensation Case. 215 Pa. Super. 83. 88. 257 A.2d 65. 67 (1969); Mattson Unempl. Compensation Case, 194 Pa. Super. 307, 314, 167 A.2d 321, 324 (1961); Midvale Co. v. Unemployment Comp. Bd., 165 Pa. Super. 359, 364, 67 A.2d 380, 383 (1949). (Prior to 1970, unemployment compensation cases in Pennsylvania were appealed from the Pennsylvania Unemployment Compensation Board of Review to the Pennsylvania Superior Court, with a right of appeal by way of petition to the Pennsylvania Supreme Court. The Appellate Jurisdiction Act of 1970, Pa. Stat. Ann. tit. 17, § 211.1-15 (Supp. 1976) transferred jurisdiction over appeals to the Pennsylvania Commonwealth Court. The right of appeal on petition to the Pennsylvania Supreme Court remains unchanged.)

the phrase practically synonymous with "unemployment" as used in the same sentence. Unemployment always involves a "stoppage of work" by the employee. Only when "stoppage of work" is construed to refer to the curtailment of the employer's operations does it acquire a meaning consonant with its usage in statutes similar to § 6 (e).[8]

There is no merit in BFI's contention that § 2 of the Act creates a general voluntariness disqualification which is incorporated into § 6 (e), and which compels the conclusion that employees who voluntarily stop work to participate in a strike are ineligible for unemployment benefits. We have consistently ruled that § 2 does not create any general disqualification based on fault. As we stated in *MEMCO v. Maryland Employ. Sec. Adm.:*

> "Although the declaration of policy enunciated in section 2 of Article 95A speaks in terms of aiding 'persons unemployed through no fault of their own,' these words do not themselves establish a disqualification based on unemployment resulting from the 'fault' of the claimant. Rather, the specific provisions set out in section 6 enumerate those grounds the legislature has determined disqualify claimants from receiving benefits." 280 Md. 536 at 548, 375 A.2d 1086 at 1093 (1977).

*See also Fino v. Md. Emp. Security Bd.,* 218 Md. 504, 507, 147 A.2d 738, 740 (1959); *Tucker v. American S. & Ref. Co.,* 189 Md. 250, 258, 55 A.2d 692, 695 (1947). Article 95A "was not intended to compel striking workmen to remain without its benefits longer than their own action made necessary." *Saunders v. Unemp. Comp. Board,* 188 Md. at 681. To hold

---

8. For jurisdictions so holding, *see* Sakrison v. Pierce, 66 Ariz. 162, 168, 185 P.2d 528, 532 (1947); Monsanto Chemical Co. v. Commr. of Labor, 229 Ark. 362, 364, 314 S.W.2d 493, 495 (1958); Inter-Island Resorts v. Akahane, 46 Hawaii 140, 148, 377 P.2d 715, 720 (1962); Totorica v. Western Equipment Co., 88 Idaho 534, 541, 401 P.2d 817, 821 (1965); Lawrence Baking Co. v. Unempl. C.C., 308 Mich. 198, 207, 13 N.W.2d 260, 263 (1944); Continental Oil Co. v. Board of Labor Appeals, 178 Mont. 143, 148, 582 P.2d 1236, 1240 (1978); Albuquerque-Phoenix Exp., Inc. v. Employment S.C., 88 N.M. 596, 600, 544 P.2d 1161, 1165 (1975).

otherwise would require us to pass on the merits of each labor dispute in which the participants sought unemployment benefits — a palpable violation of one of the fundamental tenets of the unemployment compensation law, *i.e.*, that the administering agency remain neutral in labor disputes and refrain from passing on the merits of the dispute.[9] Section 6 (e) states specifically that a labor dispute will disqualify a claimant for benefits only when it results in a stoppage of work. It makes no mention of a disqualification based on voluntariness or fault and courts will not, under the guise of statutory construction, supply omissions or remedy possible defects in a statute, or insert exceptions not made by the legislature. *Slate v. Zitomer,* 275 Md. 534, 540, 341 A.2d 789 (1974), *cert. den.,* 423 U.S. 1076, citing *Amalgamated Ins. v. Helms,* 239 Md. 529, 535-536, 212 A.2d 311 (1965). Moreover, we have long held that where a general intention is expressed in a statute, and also a particular intention incompatible with the general intention, the particular intention is considered in the nature of an exception. *Clerk v. Chesapeake Beach Park,* 251 Md. 657, 664, 248 A.2d 479, 483 (1968); *Dept. of Tide. Fisheries v. Sollers,* 201 Md. 603, 611, 95 A.2d 306, 309 (1953). The particular intent of § 6 (e), viz., to disqualify claimants only where there is a stoppage of the employer's operations (other than a lockout) must, therefore, control over the general intent of § 2.

Additionally, BFI's argument would render the "voluntarily leaving work" provision of § 6 (a) superfluous. The consensus of states which have interpreted the "voluntarily leaving work" and "labor dispute disqualification" provisions have held that they are mutually exclusive. As the court noted in *Inter-Island Resorts v. Akahane,* 46 Hawaii 140, 156, 377 P.2d 715, 724 (1962):

---

**9.** *See* Inter-Island Resorts v. Akahane, 46 Hawaii 140, 156, 377 P.2d 715, 724 (1968), citing Sakrison v. Pierce, 66 Ariz. 162, 185 P.2d 528 (1947); In re Steelman, 219 N.C. 306, 13 S.E.2d 544 (1941); Amory Worsted Mills v. Riley, 96 N.H. 162, 71 A.2d 788 (1950); W. R. Grace & Co. v. Cal. Emp. Com., 24 Cal.2d 720, 151 P.2d 215 (1944); Byerly v. Unemploy. Compensation Case, 171 Pa. Super. 303, 90 A.2d 322 (1952); Lawrence Baking Co. v. Unempl. C.C., 308 Mich. 198, 13 N.W.2d 260 (1944); T.R. Miller Mill Company v. Johns, 261 Ala. 615, 75 So.2d 675 (1954).

"[A]n individual whose unemployment is due to a 'stoppage of work' which exists because of a 'labor dispute' cannot be said to have 'left his work voluntarily' within the meaning of the voluntary separation provision."

A number of courts have concluded that

"the terms 'leaving work' or 'left his work' as used in unemployment compensation laws refer only to a severance of the employment relation and do not include a temporary interruption in the performance of services. Kempfer, Disqualifications for Voluntary Leaving and Misconduct, 55 Yale Law Journal 147, 154. Absence from the job is not a leaving of work where the worker intends a temporary interruption in the employment and not a severance of the employment relation. Such is the case of strikers who have temporarily interrupted their employment because of a labor dispute. Under the prevailing view, they have not been deemed to have terminated the employment relationship and the voluntary leaving disqualification has no application to them." [10]

Finally, BFI argues that the legislature, by ch. 153 of the Acts of 1966, inserted the "lockout" exemption in § 6 (e) as an additional expression of its intention to disqualify employees who voluntarily leave their employment as a result of a labor dispute.[11] The legislative history refutes

10. *See* Inter-Island Resorts v. Akahane, 46 Hawaii 140, 158, 377 P.2d 715, 724 (1968), citing T. R. Miller Mill Company v. Johns, 261 Ala. 615, 75 So.2d 675 (1954); Mark Hopkins, Inc. v. Cal. Emp. Com., 24 Cal.2d 744, 151 P.2d 229 (1944), 154 A.L.R. 1081; Knight-Morley v. Emp. Sec. Comm., 352 Mich. 331, 89 N.W.2d 541 (1958); Marathon Electric Mfg. Corp. v. Industrial Comm., 269 Wis. 394, 69 N.W.2d 573, 70 N.W.2d 576 (1954).

11. In the context of a labor dispute, "A lockout is the refusal by an employer to furnish available work to his regular employees." *American Ship Bldg. v. Labor Board,* 380 U.S. 300, 321, 85 S. Ct. 955, 13 L. Ed. 2d 855 (1965), White, J. concurring in the result. *See also* MEMCO v. Maryland Employ. Sec. Adm., 280 Md. 536, 546 (1977). The employer's action is properly characterized as a lockout whether the refusal is motivated by its desire to protect itself against economic injury (as where an employer locks

this contention. At the time the "lockout" exemption was adopted, another amendment was proposed which would have disqualified employees who were voluntarily unemployed.[12] The amendment was rejected. Manifestly, the "lockout" exemption does not automatically disqualify all striking employees. Rather, it allows individuals who are unemployed because of a substantial work stoppage at their employer's place of business to remain eligible for benefits if the work stoppage is the result of an employer's lockout. Without this exemption, if a lockout occurred as a result of a labor dispute, and resulted in a substantial curtailment of the employer's operations, the locked-out employees would be disqualified for benefits under § 6(e).

## IV

Having determined that "stoppage of work" in § 6 (e) refers to a curtailment of the employer's operations, we must decide what degree of curtailment is required to constitute a stoppage within the contemplation of the statute. Most jurisdictions hold that "stoppage of work" means a substantial curtailment of the employer's operations.[13] One

---

out its employees "in the face of a threatened strike under circumstances where, had the choice of timing been left solely to the unions, the employer and its customers would have been subject to economic injury over and beyond the loss of business normally incident to a strike upon the termination of the collective bargaining agreement"); American Ship Bldg. v. Labor Board, *supra,* 380 U.S. at 327 (Goldberg, J. concurring), by its desire to protect itself at the bargaining table (as where the employer is attempting to exert economic pressure on the union as means of bringing it to accept a contract with terms more favorable to the employer), or by both. *See also* MEMCO v. Maryland Employ. Sec. Adm., 280 Md. 536, 545-546 (1977); Oberer, Walter E., *Lockouts and the Law: The Impact of American Shipbuilding and Brown Food,* 51 Corn. L.Q. 193, 194 (1966); Robert P. Duvin, *The Bargaining Lockout: An Impatient Warrior,* 40 Notre Dame Law. 137 (1965).

12. The proposed amendment would have disqualified an employee for benefits where his unemployment was due to a stoppage of work which existed because of a labor dispute *"which stoppage is in the nature of a strike and not in the nature of a lockout, shutdown at the instance of the employer, or otherwise involuntary on the part of the workers."* The "lockout" exemption, as now contained in § 6 (e) was added by a separate amendment in ch. 153 of the Acts of 1966.

13. Meadow Gold Dairies — Hawaii, Ltd. v. Wiig, 50 Hawaii 225, 437 P.2d 317 (1968) (no arbitrary percentage should be set as to when a work

commentator has pointed out that seemingly inconsistent results have occurred "due to the great variety of fact situations presented," but "[a]s long as the bases for decision are correct, ... an occasional aberration is small cause for alarm."[14] Another commentator has stated that "[t]he critical breaking point would seem to be about a 20 to 30 percent cut in production as being sufficient to establish a stoppage."[15] However, the difficulty of applying a fixed percentage rule to define "substantial" has led courts to consider various other factors:

> "Since the mid-fifties, there has been a new emphasis placed upon the term 'operations.' As production increasingly represents less than totality of the employing unit's performance, decreases in business revenue, services rendered, marketing, research, and maintenance, transportation, and

---

stoppage does or does not exist, but 18.65 percent production decline constituted a stoppage of work); Inter-Island Resorts, Ltd. v. Akahane, *supra* (stoppage of work means substantial curtailment); Westinghouse Broadcasting Co. v. Director of the Division of Employment Security, *supra* (if those leaving work are immediately replaced, or if the dispute does not otherwise interfere with production or operation and these are not diminished, there is no stoppage of work and hence no disqualification); Producers Produce Co. v. Industrial Commission, *supra* (stoppage of work means substantial diminution of the activities, production or service at the employer's plant); Continental Oil Co. v. Board of Labor Appeals, *supra* (It is not necessary that all activities of the employer cease before a finding of a stoppage of work may be made. The correct test is that there must be a substantial curtailment of operations in the employer's business); Magner v. Kinney, *supra* (decrease of 30% of the total business transacted by the employer constituted a stoppage of work); Ablondi v. Board of Review, *supra* (a substantial curtailment of operations constitutes a work stoppage and a 90% reduction in production clearly met this test); Albuquerque-Phoenix Exp., Inc. v. Employment S.C., *supra* (what constitutes a substantial curtailment of work or operations at the employing establishment has generally been regarded as a question dependent upon the facts and circumstances of each case); Shell Oil Co. v. Brooks, *supra* (16% reduction in total work force did not constitute a stoppage of work); Gas Company v. Hatcher, *supra* (in some situations, a strike affecting relatively few employees would produce a stoppage of work if they were employed in the performance of duties of such vital nature that their unemployment would result in a substantial curtailment of the normal overall activities or operations of the employer).

14. Shadur, *Unemployment Benefits and the "Labor Dispute" Disqualification,* 17 University of Chicago Law Review, 294, 311 (1949-50).

15. Williams, *The Labor Dispute Disqualification — A Primer and Some Problems,* 8 Vanderbilt Law Review 338, 340 (1955).

construction activities have come to the fore as indicia of substantialness." [16]

Using these criteria, the evidence in the case before us clearly demonstrates that there was not a substantial work stoppage in BFI's operations. This was the factual finding of the Board of Appeals which, under § 7 (h) of the Act, is conclusive in the absence of fraud, if supported by evidence. *See MEMCO v. Maryland Employ. Sec. Adm., supra; Watkins v. Employment Sec. Adm.,* 266 Md. 223, 292 A.2d 653 (1972); *Bethlehem Steel Co. v. Board,* 219 Md. 146, 148 A.2d 403 (1959); *Brown v. Md. Unemp. Comp. Board,* 189 Md. 233, 55 A.2d 696 (1947); *Mitchell, Inc. v. Md. Emp. Sec. Bd.,* 209 Md. 237, 121 A.2d 198 (1956). There has not been any allegation of proof of fraud, and we cannot say as a matter of law that the finding of the Board was not supported by the evidence. Consequently, we hold that there was no stoppage of work within the meaning of § 6 (e).

> *Judgment reversed; case remanded to the Circuit Court for Montgomery County with directions that it affirm the order of the Board of Appeals; costs to be paid by the appellee.*

*Smith, J., dissenting:*

Unemployment compensation was intended to be exactly what its name implies, insurance against the economic hardship and misfortune of unemployment. Contrary to popular belief, employees pay no part of the cost of operation of that system. It is the employers of this country who bear its full burden. Many small employers resent the substantial financial load they are obliged to carry without any of their employees ever having sought or needed unemployment insurance benefits. When striking individuals are paid from

---

**16.** Lewis, The "Stoppage of Work" Concept in Labor Dispute Disqualification Jurisprudence, 45 J. Urban Law, 319, 332 (1967).

this Fund as in this situation, the financial burden of all employers is increased. Employers are in effect subsidizing strikes.

It is obvious to me that it was in the context of protection against unemployment by virtue of economic circumstances that this statute was enacted which makes an individual ineligible for benefits when the reason he is not working is his participation in a strike. A person who is not working because of a strike called by his union is not out of work because of economic conditions. His employer should not be expected to insure the worker against the worker's going out on strike.

I note that the majority states:

> "Even without the compelling weight of English and American precedents, we are convinced that the phrase 'stoppage of work' in § 6 (e) refers to the curtailment of the employer's operations. To interpret 'stoppage of work' as cessation of work by the individual employee would make the phrase practically synonymous with 'unemployment' as used in the same sentence. Unemployment always involves a 'stoppage of work' by the employee. Only when 'stoppage of work' is construed to refer to the curtailment of the employer's operations does it acquire a meaning consonant with its usage in statutes similar to § 6 (e)."

I see nothing wrong with the language of § 6 (e) as I would interpret it. I believe it was enacted to make clear the legislative intent.

I do not believe, as the majority states, that "BFI's argument would render the 'voluntarily leaving work' provision of § 6 (a) superfluous." There is a need for that provision to protect the Fund from claims of employees who leave their jobs of their own free will and accord but who are not out on strike.

I note that the weight of authority is contrary to the position I take. I am not obliged, however, to follow the weight

of authority when I know it to be patently in error. If the weight of authority were that the sun rises in the west or that the outgoing tide of the Chesapeake Bay flows to the north, I certainly would not follow it. There is much to be said for comity, but it has no place when the majority view is plainly wrong as in this case. Moreover, I suspect that the employees involved here know in their hearts that the decision of the judge of the Circuit Court for Montgomery County holding them disqualified was absolutely right because they did not appeal despite the fact that they undoubtedly had counsel through their union available to them for such purpose. The appeal is brought through the action of the Attorney General of Maryland.

These people were no more unemployed in the common meaning of the term as the public understands it than am I. Hence, they should be denied benefits. I would affirm.