551 A.2d 121

EASTALCO ALUMINUM COMPANY

v.

BOARD OF APPEALS, DEPARTMENT OF EMPLOYMENT AND TRAINING and John H. Jones et al.

No. 181, Sept. Term, 1987.

Court of Appeals of Maryland.

Dec. 27, 1988.

N. Peter Lareau (Darrell R. VanDeusen, Venable, Baetjer and Howard, all on brief), Baltimore, for appellant.

Amy S. Scherr, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, Robert Fulton Dashiell (I. Duke Avnet, David S. Epstein, Wartzman, Rombro, Omansky, Blibaum & Simons, P.A., all on brief), Baltimore, for appellee.

J. Cookman Boyd, Jr., Rob Ross Hendrickson, Boyd, Benson & Hendrickson, all on brief, Baltimore, amicus curiae for The Maryland Chamber of Commerce.

William H. Zinman on brief of Baltimore, amicus curiae for The Maryland State & D.C. AFL–CIO.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

BLACKWELL, Judge.

This unemployment compensation case involves an interpretation of Maryland Code (1957, 1985 Repl.Vol.), Article 95A, § 6(e), which provides in pertinent part that individuals shall be disqualified for unemployment benefits if their "unemployment is due to a stoppage of work, *other than a lockout*, which exists because of a labor dispute ..." (emphasis added).[1] We granted certiorari to determine whether the employees' refusal to accept available work offered by the employer, at terms specified by the employer, constitutes a "lockout." Because we answer this issue in the affirmative, the employees in the present case were entitled to unemployment compensation and the ruling of the circuit court was correct.

---

1. All references to the Maryland Code are to the Unemployment Insurance Law Article, Art. 95A, unless otherwise indicated.

The following factual background was included in the Findings of Fact of the Special Examiner, which were later adopted by the Board of Appeals of the State Department of Employment and Training.[2] Appellant, Eastalco Aluminum Company (Eastalco), and the United Steelworkers of America, Local Union 7886 (Union) were parties to a collective bargaining agreement which expired at midnight on July 31, 1986. In May of 1986, Eastalco and the Union notified each other of their mutual desire to commence negotiations in an effort to reach a new agreement. The parties held several meetings, two of which were held immediately preceding the expiration of the contract. Throughout the negotiations, Eastalco proposed that the Union accept certain concessions in the terms and conditions of employment.[3] The Union insisted that it was unwilling to accept the concessions.[4] The parties were unable to reach an agreement by midnight, July 31, 1986.

During the last days of negotiation prior to the actual stoppage of work, the plant was substantially damaged by unknown individuals. Eastalco used additional security personnel in an effort to protect the plant equipment. Management was also utilized in an attempt to minimize damage and continue production. At approximately 6:30 p.m. on July 31, 1986, Eastalco began replacing Union employees with management personnel and outside non-union employees. Despite the transition, the Union personnel who had been scheduled to work that evening were paid for their full

---

2. *See* Benefit Determination No. 463, Special Examiner John T. McGucken, November 7, 1986; Decision of the Board of Appeals, No. 148–BH–87, Thomas W. Keech, Chairman, February 27, 1987.

3. Eastalco's demands included: reduced vacation days, reduction of wages for temporary employees, waiver of check-off of dues and elimination of arbitration of disputes arising under the contract.

4. The Union maintained that they were unwilling to grant Eastalco any concessions unless the company was willing to open its books. Eastalco was unwilling to do this, but continued to demand concessions.

shift. Subsequent to July 31, 1986, any Union person who desired to enter the plant facilities was permitted to do so, but the individual had to be accompanied by security personnel.

Prior to and at the time the parties broke off negotiations on July 31, 1986, Eastalco informed the Union that work was available for employees after the contract expired under the terms and conditions of the proposal which the company had presented to the Union at that time.[5] The Union rejected this offer and instead proposed that the Company extend the agreement which was about to expire. The Union offered to continue working until a new collective bargaining agreement could be reached. When the parties were unable to agree upon the terms and conditions under which the employees would work after expiration of the agreement, the Union established picket lines.

At no time did Eastalco offer the Union the opportunity to continue working under the terms and conditions of the expired contract.[6] After July 31, 1986, the Union reiterated its offer to return to work under the terms of the expired contract pending negotiations. Eastalco again rejected the offer, insisting that the employees could return to work only under the terms and conditions of its proposal. The Union changed its picket signs to read "Locked Out," and the employees applied for unemployment benefits.

The Special Examiner found that a work stoppage did occur at the Eastalco plant, and that the employees "were

---

**5.** The Union was allegedly offered an extension modeled after that reached by a sister company, Intalco. The Union rejected this offer because it included employee concessions. The Circuit Court disagreed with the Special Examiner's finding that the final offer to the Union was the same as that reached with Intalco. Nonetheless, it is undisputed that Eastalco's offers differed from the terms and conditions of the expired collective bargaining agreement.

**6.** This was due in part to Eastalco's continuing apprehension that damage to the plant would recur until a new agreement was attained.

locked out because of the insistence [of] the employer to gain concessions from them."[7]  The Examiner reasoned that the claimants were "locked out" as a result of not being "permitted to continue working under the terms of their agreement, and it was the employer who was seeking a change in the status quo which caused the unemployment of the claimants."  Pursuant to § 6(e), the claimants were eligible for unemployment benefits.

Subsequently, the Board of Appeals affirmed the conclusions of the Special Examiner, and stated:

Using the words of the *Memco* decision [*Memco et al. v. Maryland Employment Security Administration, et al.,* 280 Md. 536, 545–6, 375 A.2d 1086, 1092 (1977)] quite literally, the Board finds that the employer's refusal to maintain the status quo and allow the workers to continue working under the same terms and conditions as previously, in the face of the employees' explicit offer to do so, constitutes a lockout within the meaning of Section 6(e) of the law.

The Board of Appeals concluded that this application of the lockout exception gives an "adjudicating body a definable yardstick with which to judge such a situation without becoming entangled in the equities of the parties' collective bargaining positions, and the whole history of the industry in question."  The Board of Appeals determined that it was inappropriate to review the respective merits of the labor dispute.  The only relevant consideration is whether the claimants are entitled to unemployment benefits under the Maryland statute.

The Circuit Court for Frederick County affirmed the

---

7.  The Special Examiner concluded that a work stoppage occurred based upon the substantial reduction of certain products by the employer, the inability to produce other products because of a lack of skilled manpower, and damage to the employer's facilities.  This work stoppage lasted until approximately October 21, 1986, when a new collective bargaining agreement was reached.

reasoning of the Board of Appeals.[8]   Eastalco appealed to the Court of Special Appeals.   We granted certiorari prior to a decision by that court to determine the proper construction of § 6(e) of the Act.

Pursuant to Art. 95A, § 7(h), "the findings of the Board of Appeals as to the facts, if supported by competent, material and substantial evidence in view of the entire record, and in the absence of fraud, shall be conclusive, and the jurisdiction of said court shall be confined to questions of law."   As otherwise stated, a reviewing court shall apply the substantial evidence test to the final decisions of an administrative agency, but it must not itself make independent findings of fact or substitute its judgment for that of the agency. *Board of Education of Montgomery County v. Paynter*, 303 Md. 22, 35, 491 A.2d 1186, 1192 (1985). However, this does not reduce the function of a reviewing court to determine whether the administrative agency made an error of law. *Id.* at 35, 491 A.2d at 1192–93.   The scope of review concerns whether a reasoning mind could have reached the factual conclusion the agency reached. *Id.; see also Baltimore Lutheran High School v. Emp. Sec. Admin.*, 302 Md. 649, 662, 490 A.2d 701, 708 (1985); *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 512–13, 390 A.2d 1119, 1123 (1978) (citations omitted).[9]   The appellate court also must review the agency's decision in a light most favorable to the agency, since decisions of administrative agencies are prima facie correct and carry with them the presumption of validity. *Id.* [303 Md.] at 35–36, 491 A.2d at 1193.

In the present case, the Findings of Fact, as adopted by the Board of Appeals, are supported by competent, material

---

**8.** Although the Circuit Court disagreed with the Board of Appeals' emphasis on the *Memco* decision, the judge stated, "I have found that a reasoning mind reasonably could have reached the same conclusions as the Board," and refused to disturb the decision of the Board.

**9.** In *Bulluck v. Pelham Wood Apts.*, Judge Eldridge, writing for the Court, observed that "substantial evidence" has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

and substantial evidence contained in the record. We shall therefore limit our discussion to the merits of the Board's conclusion of law that the claimants were subject to a lockout, within the meaning of § 6(e).

I

## STATUTORY BACKGROUND

The express public policy purpose of the Unemployment Insurance Law of Maryland (Unemployment Law), Art. 95A, § 2, is to provide "unemployment reserves to be used for the benefit of persons unemployed through no fault of their own." This "Declaration of Policy" section states that economic insecurity due to unemployment is a serious menace to the state, that involuntary unemployment is a subject of general interest, and that the systematic accumulation of funds is necessary to provide benefits for periods of unemployment. In our application of the Unemployment Law, we should bear in mind the remedial nature of unemployment compensation, from which flow the principles that such laws should be read liberally in favor of eligibility, and that disqualification provisions are to be strictly construed. *Sinai Hospital of Baltimore, Inc. v. Department of Employment and Training, et al.*, 309 Md. 28, 40, 522 A.2d 382, 388 (1987); *Allen v. Core Target City Youth Program*, 275 Md. 69, 75, 338 A.2d 237, 241 (1975).

In *Employment Security Administration v. Browning–Ferris, Inc.*, 292 Md. 515, 438 A.2d 1356 (1982), Chief Judge Murphy noted for the Court "that § 2 does not create any general disqualification based on fault." *Id.* at 525, 438 A.2d at 1362. *See also Memco v. Maryland Employ. Sec. Admin.*, 280 Md. 536, 548, 375 A.2d 1086, 1093 (1977). As we stated in *Memco:*

Although the declaration of policy enunciated in section 2 of Article 95A speaks in terms of aiding 'persons unemployed through no fault of their own,' these words do not themselves establish a disqualification based on unemployment resulting from the 'fault' of the claimant.

Rather, the specific provisions set out in section 6 enumerate those grounds the legislature has determined disqualify claimants from receiving benefits.
*Id.*, 280 Md. 536 at 548, 375 A.2d 1086 at 1093 (citation omitted). Judge Murphy concluded his analysis by stating that, "The particular intent of § 6(e), viz., to disqualify claimants only where there is a stoppage of the employer's operations (other than a lockout) must, therefore, control over the general intent of § 2." *Browning–Ferris*, 292 Md. at 526, 438 A.2d at 1363. We therefore focus on the interpretation of § 6(e) in the context of the present facts.

## II
## CONSTRUCTION OF ART. 95A § 6(e)

We turn to the specific statutory language in controversy. Subject to exceptions not applicable here, § 6(e) disqualifies a claimant "For any week with respect to which the Executive Director finds that his unemployment is due to a stoppage of work, other than a lockout, which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed...." [10] We have had several opportunities to examine the scope of the lockout exception. In the leading case of *Memco, supra*, a local union of meat cutters worked for member employers of a labor relations association known as FELRA which represented several individual retail food employers. These employers included Giant Foods, Inc. and Safeway Stores, Inc.. When the collective bargaining agreement with FELRA expired, and a new agreement was not attained, the local union went on strike against Giant stores only. The union instructed its members to continue working for all of the other employers of FELRA. Subsequent-

---

10. This subsection was amended by Ch. 153 of the Laws of 1966, effective June 1, 1966. Prior to this amendment, employees would be disqualified from receiving unemployment benefits regardless of whether the dispute was characterized as a strike or a lockout. *See Baltimore Typographical Union No. 12, et al. v. Hearst Corp.*, 246 Md. 308, 318, 228 A.2d 410, 415 (1967).

ly, the other employers refused to allow the non-striking meat cutters to work at their stores. The union employees applied for and were awarded unemployment benefits. We affirmed the rulings of the Circuit Court and of the Board of Appeals, holding:

> Since, under these circumstances, the claimants' employers were directly responsible for the work stoppage at FELRA member stores other than Giant in that they refused to maintain the status quo in spite of the workers' willingness to continue working under pre-existing terms, it is plain that a 'lockout' and not a 'strike' existed at each claimant's last place of employment.

280 Md. at 545–46, 375 A.2d at 1092 (footnote and citation omitted).

The *Memco* court further reasoned that "the Maryland legislature, by choosing to exempt the lockout situation from labor disputes disqualifying claimants from benefits, has in essence determined what is a voluntary [cause] and what is an involuntary cause of unemployment." *Id.* at 547, 375 A.2d at 1093. This interpretation is consistent with our general reluctance to delve into the subjective intent of parties involved in labor disputes. It is clear that the legislature has expressly chosen to exclude locked out employees from the labor dispute disqualification. Where a stoppage of work is directly caused by an employer's lockout, claimants are not disqualified from receiving unemployment benefits.

A second analysis of the lockout exception occurred in *Browning–Ferris, supra.* There, we held that there was no stoppage of work within the meaning of § 6(e). Upon review of the legislative history of the provision, we concluded that "the 'lockout' exemption does not automatically disqualify all striking employees. Rather, it allows individuals who are unemployed because of a substantial work stoppage at their employer's place of business to remain eligible for benefits if the work stoppage is the result of an employer's lockout." 292 Md. at 528, 438 A.2d at 1364.

## III·

## LOCKOUT EXEMPTION ANALYSIS

The term "lockout" has been defined as "the temporary closing of a business or the refusal by an employer to allow employees to come to work until they accept the employer's terms." *The Random House Dictionary of the English Language* 1129 (2d Ed.1987) (unabridged). It has also been described as the "cessation of furnishing of work to employees or withholding work from them in [an] effort to get for [the] employer more desirable terms." *Black's Law Dictionary* 848 (5th Ed.1979); (citing *Zura v. Marblehead Stone Division, Standard Slag Corp.*, 13 Ohio Misc. 317, 224 N.E.2d 176, 178 (1965). A "lockout" is in essence the counterpart of an employee's strike. The focus is on the employer's conduct. This traditional concept of the term "lockout" as a withholding of work by an employer seeking to gain some economic advantage over the employees is well accepted. *See* Annotation, *Unemployment Compensation: Application of Labor Dispute Disqualification for Benefits to Locked Out Employee*, 62 A.L.R.3d 437, § 3 (1975); *see, e.g., Memco*, 280 Md. at 546, 375 A.2d at 1092; *see also Unemployment Compensation Board of Review v. Borger Steel Co.*, 30 Pa.Cmwlth. 75, 372 A.2d 969 (1977); *Be–Mac Transport Co. v. Grabiec*, 20 Ill.App.3d 345, 314 N.E.2d 242 (1974).

■ It is our view that a determination of lockout status should not be limited to an actual physical closing of a place of employment. The following factors are proper considerations for an administrative body or for a reviewing court in the determination of lockout status:

(1) Have the employees offered to continue working, pending negotiation and for a reasonable time, under the same terms and conditions of the expired collective bargaining agreement.

(2) Has the employer agreed to permit work to continue for a reasonable time under the preexisting terms and

conditions of employment pending further negotiations.

If the employer refuses to extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a "lockout." *See Erie Forge and Steel Corporation v. Unemployment Compensation Board of Review,* 400 Pa. 440, 444–45, 163 A.2d 91, 93–94 (1960).

■ This assessment should be made objectively without any analysis of the merits of the labor dispute. *See Sinai Hospital,* 309 Md. at 42–43, 522 A.2d at 389 (citations omitted); *see also Browning–Ferris,* 292 Md. at 525–26, 438 A.2d at 1362. (Citations omitted). It is inappropriate for the reviewing body to assess the reasonableness of the parties' bargaining positions. The process of collective bargaining must be left free and untrammeled for both employers and employees. Both sides should have an equal opportunity to secure favorable terms of employment. In determining lockout status, the reviewing body is limited to concluding whether claimants are entitled to unemployment compensation. Without assessing the relative fault of the parties involved in a labor dispute, the reviewing body should merely classify the work stoppage as a strike or a lockout.

■ In applying the principles of *Memco* and *Browning–Ferris* to the present facts, and in light of the commonly accepted definition of the term "lockout", we are convinced that the unemployment was caused by a lockout at the Eastalco plant facilities. It is evident what action precipitated the employees' unemployment. The unilateral act of Eastalco in refusing to allow the Union to continue working at the status quo during negotiations was the primary cause of the employees' unemployment. On several occasions, the Union expressly offered to return to work while negotiations continued. These offers were unilaterally rejected by Eastalco. The company continually insisted that the Union could only return to work under the terms of its proposal. Under these circumstances, Eastalco should be

held accountable for the resulting unemployment of the Union employees.

Here, we find no error in the Board of Appeals' conclusion of law, as well as that of the Circuit Court, that the Union employees were subject to a lockout within the meaning of § 6(e).

JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT, EASTALCO ALUMINUM COMPANY.